# EXHIBIT A

## CONTINENT GRAIN CHARTERPARTY
### Code name: "SYNACOMEX 2000"
Adopted PARIS 1957 by SYNDICAT NATIONAL DU COMMERCE EXTERIEUR DES CEREALES
amended 1962, 1974, 1980 and 2000 in agreement with COMITE CENTRAL DES ARMATEURS DE FRANCE
in cooperation with Chambre Arbitrale Maritime de Paris and the French Chartering and S. & P. Brokers' Association

**PART I**

| | |
|---|---|
| 1. Shipbroker(s)<br>ABACUS SHIPPING LTD<br>9 RITZ PARADE<br>WESTERN AVENUE<br>LONDON W5 3RA | 2. Place and date of Charter Party<br>LONDON 08TH AUGUST 2007 |
| 3. Owners and place of business (state full style and address) (Cl. 1)<br>ANGLOMARINE SHIPPING LTD, 18 MANSELL STREET, E1 8AA, LONDON, UNITED KINGDOM | 4. Charterers and place of business (state full style and address) (Cl. 1)<br>CONTI AGRO NIGERIA LIMITED |
| 5. Vessel's name (Cl. 1) HONG PROSPERITY<br>flag / built / class: ST VINCENT & THE GRENADINES/1981/<br>AMERICAN BUREAU OF SHIPPING<br>NT / GT: 7,529.00 / 13,228.00<br>summer DWT: 19,409.00 | 6. First layday date (Cl. 6) 12 AUGUST 2007<br><br>Cancelling date (Cl. 6) 20 AUGUST 2007<br><br>7. Present position / expected ready to load (Cl. 1) |
| 8. Loading port(s) (Cl. 2)<br>1 GSP 1GSB KANDLA<br><br>a) Always afloat (*)  b) "safety aground" (*) | 9. Advance notices (Cl. 7)<br><br>- at load port to: |
| 10. Discharging port(s) (Cl. 3)<br>1-2 EACH 2 GSPS LAGOS, PORT HARCOURT, PORT HARCOURT TO BE THE LATTER ONE<br><br>a) Always afloat (*)  b) "safely aground" (*) | - at discharging port: number of days / to: |
| 11. Cargo nature and quantities (Cl. 2)<br>12,500 MT MIN/18,000 MAX IN OWNERS OPTION BAGGED RICE PACKED IN 50 KILO BAGS ONE GRADE STOWING ON BOARD MAXIMUM IN 5'1. ALWAYS PADDY RICE IS NOT ALLOWED TO BE LOADED<br><br>a) No bags (*)  b) Maximum in bags for stowage (*) 5'1 | 12. Freight rate (Cl. 4)<br>USD 98.50 PER INT MT FIOS BSS 1/2 - ALWAYS FREE D/A AT ALL DISCHARGING PORTS. |
| 13. Freight rate payment (state currency and method of payment, beneficiary and bank account) (Cl. 4)<br>100 PCT FREIGHT PAYABLE LESS COMMISSIONS WITHIN 3 BANKING DAYS FROM SIGNING-RELEASING BILLS OF LADING MARKED FREIGHT PAYABLE AS PER CHARTER PARTY DATED 8 AUGUST 2007 DIRECT TO DISPONENT OWNERS BANK ACCOUNT. DEMURRAGE IF ANY OR LESS DESPATCH AGREED IF ANY PAYABLE 20 DAYS AFTER OF COMPLETION OF DISCHARGING AND PRESENTATION OF ALL RELEVANT DOCUMENTS | 14. Loading rate (Cl. 5)<br>2,500 MT PER WWD SHEX SATURDAY 12:00 CLAUSE TO APPLY EIU<br><br>15. Discharging rate (Cl. 5)<br>1,000 MT PER WWD SHEX SATURDAY 12:00 CLAUSE TO APPLY<br><br>16. Demurrage / Despatch money (Cl. 9)<br>USD 9,000 PER DAY PRO RATA HDWTS AT BENDS |
| 17. Agents at loading port(s) (Cl. 13) | 18. Agents at discharging port(s) (Cl. 13) |
| 19. Extra insurance, maximum (Cl. 14)<br>FREE - FOR CHARTERERS ACCOUNT | 20. Brokerage commission and to whom payable (Cl. 15)<br>1.25% ABACUS SHIPPING LTD |
| 21. Address Commission (Cl. 16)<br>2.5% | a) Deductible (*)  b) Non-deductible (*) |
| 22. Numbers of the additional clauses covering special provisions, if any agreed<br>ADDITIONAL CLAUSES FROM CLAUSE 30 TO CLAUSE 53 ARE DEEMED TO BE INCORPORATED INTO THIS CHARTER PARTY | |

It is mutually agreed that this Charter Party shall be performed subject to the conditions contained herein consisting of PART I and PART II including additional clauses if any agreed and listed in Box 22. In the event of a conflict of conditions, the provisions of PART I shall prevail over those of PART II to the extent of such conflict but no further.

| For the Owners | For the Charterers |
|---|---|
| | |

(*) Delete as appropriate; if no deletion, alternative (a) to apply.

This document is a computer generated SYNACOMEX printed by authority of SYNDICAT NATIONAL DU COMMERCE EXTERIEUR DES CEREALES (SYNACOMEX). Any insertion or deletion to the form must be clearly visible, in the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original SYNACOMEX document shall apply. BIMCO and SYNACOMEX assume no responsibility for any loss, damage or expense as a result of discrepancies between the original SYNACOMEX document and this computer generated document.

## PART II
## "SYNACOMEX 2000" Continent Grain Charterparty

**1. Owners, Charterers**
It is this day agreed between the party designated in Box 3, Owners of the Vessel named and described in Box 6, being now in position and expected ready to load as mentioned in Box 7, and the party designated in Box 4 as Charterers, THAT

**2. Loading Port(s) and Cargo**
The said Vessel being tight, staunch and in every way fit for the voyage, shall with all convenient speed proceed to the place designated in Box 8 (Safe Berth / safe anchorage Nautical), which in case of named port(s)
Owners acknowledge as safe and suitable for this Vessel and there load always afloat, unless "safely aground" has been specifically agreed in Box 8, in such safe berth, dock, wharf or anchorage as Charterers or their Agents or Shippers may direct a full and complete cargo of wheat and/or maize and/or rye and/or barley as described in Box 11, in metric tons (5 % more or less in Owners' option) in bulk. Shippers have the option of using a second safe berth. The time for shifting between the two berths shall count as laytime, but shifting expenses shall be for Vessel's account. Owners shall provide and install at their risk and expense and on their time all that is required for safe stowage of grain according to local and international regulations.
The cargo shall not exceed what the Vessel can reasonably stow and carry over and above her bunkers, apparel, stores, provisions and accommodation. The whole cargo shall be carried and stowed under deck in unobstructed main holds. All cargo on board to be delivered.
Furthermore, if stowage bags have been specifically agreed, the following shall apply:
Charterers shall supply for stowage purposes a quantity of bagged cargo not exceeding the quantity specified in Box 11, which shall be stowed at their risk and expense. The number of bags signed for on Bills of Lading to be binding on Vessel and Owners, unless error or fraud be proved.

**3. Discharging Port(s)**
Being so loaded, the Vessel shall proceed with all convenient speed direct to the place designated in Box 10, which in case of named port(s) Owners acknowledge as safe and suitable for this Vessel, and there discharge the cargo always afloat, unless "safely aground" has been specifically agreed in Box 10, in such safe berth, dock, wharf or anchorage as Charterers or their Agents or Receivers may direct. Receivers have the option of using a second safe berth. The time for shifting between the two berths shall count as laytime, but shifting expenses shall be for Vessel's account.

**4. Freight**
The freight agreed under this Charter Party shall be as stated in Box 12, per metric ton on nett Bill of Lading weight and shall be deemed earned as cargo is loaded on board, prepaid discountless and non-returnable, Vessel and/or cargo lost or not lost.
The freight shall be paid as specified in clause 47 Box 13. All charges and dues levied on the cargo shall be for Charterers' account and those levied on the Vessel howsoever assessed shall be for Owners' account.

**5. Loading and Discharging**
Cargo shall be loaded, spout-trimmed and/or stowed at the risk and expense of Shippers/Charterers at the average rate stated in Box 14. See also Clause 8 weather permitting. Cargo shall be discharged at the risk and expense of Receivers/Charterers at the average rate stated in Box 15, weather permitting.
Stowage shall be under Master's direction and responsibility. Shippers' and/or Charterers' representatives have the right to be on board the Vessel during loading, discharging or lightering for the purpose of inspecting the cargo and/or weighing. Charterers and Owners are allowed to work overtime, such expenses shall be for account of the party ordering same. If ordered by Port Authorities, overtime shall be for Charterers' account. Overtime services rendered by ship's crew shall be in all cases for Owners' account.

**6. Laydays, Cancelling**
At port of loading laytime shall not count before 08.00 hours on the layday date stated in Box 6 and in any case not before the date notified by the 10 days notice as per Clause 7. Should the Vessel's notice of readiness not be validly tendered as per Clause 8 before 09.00 hours on the cancelling date stated in Box 6, Charterers shall have the option of cancelling this charter at any time thereafter, but not later than one hour after the notice is validly tendered.

**7. Vessel's Positions, Notices**
Master and/or Owners shall give 10 days and thereafter 5 days notice of Vessel's expected readiness to load to the party designated in Box 9.
Master and/or Owners shall give notice of Vessel's Expected Time of Arrival (ETA) at discharging port as specified in Box 9 (to be advised).
Master and/or Owners shall give the relevant parties prompt advice of any substantial change in Vessel's ETA at loading and at discharging ports.

**8. Laytime**
Vessel's written notice of readiness to load and/or discharge shall be tendered by hand or by any means of telecommunication at the offices of Shippers/Charterers/Receivers or their Agents between 08.00 and 17.00 hours on all days except Saturdays, Sundays and Holidays and between 08.00 hours and 12.00 hours on Saturdays unless a holiday. Such notice of readiness shall be delivered when Vessel is in the loading or discharging berth and in all respects ready to load/discharge. At both ends if the berth is congested/unreachable Master has the right to tender N.O.R from the anchorage even by cable telex fax email and time to count whether in berth or not, whether in port or not, whether free of pratique or not, whether customs cleared or not. At loading port Shippers/
Charterers or their Agents have the privilege to inspect Vessel's holds if it is requested by Charterers a survey may be carried out in free time and risk to establish vessel's holds and fit in all ways suitability to load bagged rice and owners to have the right to be represented during such survey by their pet surveyor and reject the notice when holds are not clean dry, odourless, and in all respects ready to receive the cargo.
In case of dispute an independent surveyor shall decide about Vessel's readiness to load, the party in the wrong bearing the costs. In case of disagreement between the two surveyors then an independent surveyor (mutually agreed between Charterers' and the owners prt surveyor) to be appointed whose findings to be binding for both parties. In case of any deficiency, then same to be promptly made good by the Owners and any time lost from the time of rejection till the time of acceptance not to count as laytime. If the rejection of notice of readiness is undisputed or confirmed by surveyor the laytime will only start to count after the Vessel has validly tendered again when ready.
Only when the loading and/or discharging berth is unavailable, Master may warrant that the Vessel is in all respects ready and may tender notice of readiness to load and/or discharge from any usual waiting place, whether in port or not, whether in free pratique or not, whether customs cleared or not.
Laytime shall commence at 14.00 hours if notice of readiness to load and/or discharge is validly tendered at or before 12.00 hours and at 08.00 hours on the next working day if notice of readiness is validly tendered after 12.00 hours. Time used before commencement of laytime shall

This document is a computer generated SYNACOMEX 2000 form printed by authority of SYNDICAT NATIONAL DU COMMERCE EXTÉRIEUR DES CÉRÉALES (SYNACOMEX). Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original SYNACOMEX document shall apply. SNCO and SYNACOMEX assume no responsibility for any loss, damage or expense as a result of discrepancies between the original SYNACOMEX document and this computer generated document.

## PART II
## "SYNACOMEX 2000" Continent Grain Charterparty

not count. Laytime shall not count between 12.00 hours on Saturdays or 17.00 hours on days preceding a Holiday and 08.00 hours on the following working day, unless used, in which case half time actually used shall count. 124 125 126 127
Any delays caused by ice, floods, quarantine or by cases of force majeure, shall not count as laytime unless the Vessel is already on demurrage. Once on demurrage always on demurrage but charter party exceptions always to apply. Gear breakdown/crew and/or officers strike failure to pay any disbursements/accounts for Owners' account etc. 128 129 130
When Master has tendered notice of readiness to load or discharge from a waiting place and Vessel is subsequently found unready in application of the above provisions, laytime or time on demurrage shall not count from the time the Vessel is rejected until the time she is accepted. Additionally, any actual time lost on account of Vessel's obtaining free pratique or customs clearance shall not count as laytime or time on demurrage. 131 132 133 134 135 136 137 138
At second or subsequent port(s) of loading or discharging, laytime or time on demurrage shall resume counting from Vessel's arrival at loading or discharging berth, if available, or from Vessel's arrival at a usual waiting place, if berth is unavailable. 139 140 141 142 143
At all ports any time lost shifting from waiting place to berth shall not count as laytime or as time on demurrage. 144 145

**9. Demurrage, Despatch Money** 146
Demurrage is payable by Charterers at the rate stated in Box 18 per day of 24 consecutive hours or pro rata. Owners shall pay to Charterers despatch money for laytime saved in loading/discharging at the rate stated in Box 18 per day of 24 consecutive hours or pro rata. 147 148 149 150 151

**10. Seaworthy Trim** 152
If ordered to be loaded or discharged at more than one berth and/or port, the Vessel is to be left in seaworthy trim to Master's reasonable satisfaction for the passage between berths and/or ports at Shippers'/Charterers'/Receivers' expense, and time used for placing Vessel in seaworthy trim shall count as laytime or time on demurrage. 153 154 155 156 157 158

**11. Fumigation** 159
Charterers have the liberty to fumigate the cargo on board at loading and discharging ports or places en route at their risk and expense. Charterers are responsible for ensuring that Officers and Crew as well as all other persons on board the Vessel during and after the fumigation are not exposed to any health hazards whatsoever. Charterers undertake to pay Owners all necessary expenses incurred because of the fumigation and time lost thereby shall count as laytime or time on demurrage. When fumigation has been effected at loading port and has been certified by proper survey or by a competent authority, Bills of Lading shall not be claused by Master for reason of insects having been detected in the cargo prior to such fumigation. 160 161 162 163 164 165 166 167 168 169 170 171 172

**12. Lights and Gear** 173
Whenever required, Vessel shall supply free use of lights as on board but sufficient to carry on night work. Provided described as geared, Vessel, whenever required, shall supply free use of all cargo handling gear on board, in good working order, with the necessary power, and of runners, ropes and slings as on board. Shore hands shall be used to drive the gear, at Shippers'/Charterers'/Receivers' account. Any time actually lost on account of breakdown of Vessel's gear shall not count as laytime or time on demurrage and any stevedore standby time charges incurred thereby shall be for Owners' account. The gear's cranes breakdown, then laytime not to count but always on pro rata basis. 174 175 176 177 178 179 180 181 182 183 184

**13. Agencies** 185

At loading port, Vessel shall be consigned to the Agents designated in Box 17 and clauses 32. 186 187
At discharging port, Vessel shall be consigned to the Agents designated in Box 19 and clauses 32. 188 189

**14. Extra Insurance** 190
Extra insurance on cargo due to Vessel's age and/or buy and/or class shall be for Owners' account. Up to the amount specified in Box 19, such extra insurance shall be covered by Charterers for Owners' account and shall be deducted from settlement of freight. 191 192 193 194 195

**15. Brokerage** 196
A brokerage commission as stated in Box 20 on the gross amount of freight, deadfreight and demurrage earned, is due to the party(ies) designated in Box 20 and is deductible from same unless "non-deductible" has been specifically agreed. 197 198 199 200 201

**16. Address Commission** 202
An address commission as stated in Box 21 on the gross amount of freight, deadfreight and demurrage earned is due to Charterers and is deductible from freight, deadfreight and demurrage. 203 204 205 206

**17. ISM Clause** 207
From the date of coming into force of the International Safety Management (ISM) Code in relation to the Vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the Vessel and "the Company" (as defined by the ISM Code) shall comply with the requirements of the ISM Code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers. Except as otherwise provided in this Charter Party, loss, damage, expense or delay caused by failure on the part of the Owners or "the Company" to comply with the ISM Code shall be for the Owners' account. 208 209 210 211 212 213 214 215 216 217 218 219 220

**18. Bills of Lading** 221
The Master is to sign Bills of Lading as presented without prejudice to the terms, conditions and exceptions of this Charter Party. If the Master delegates the signing of Bills of Lading to his Agents, he shall give them authority to do so in writing, copy of which is to be furnished to Charterers. When Bills of Lading marked "Freight prepaid" are required, same shall be released by Owners immediately upon receipt of a telex from Charterers/Bank confirming that freight payable has been irrevocably transferred. 222 223 224 225 226 227 228 229 230

**19. Relet** 231
Charterers have the right to relet all or part of this Charter Party, they remaining responsible for its due fulfilment. 232 233

**20. Deviation** 234
Deviation in saving or attempting to save life or property at sea or for bunkering purposes or any other reasonable deviation shall not be deemed an infringement of this Charter Party and the Owners shall not be liable for any loss or damage resulting therefrom. 235 236 237 238 239

**21. Lien Clause** 240
The Owners shall have a lien on the cargo for freight, deadfreight, demurrage and average contribution due to them under this Charter Party. 241 242 243

**22. Responsibilities and Immunities** 244
Except as otherwise provided and stipulated in this Charter Party, it is hereby expressly agreed that this Charter Party 245 246

This document is a computer generated SYNACOMEX 2000 form printed by authority of SYNDICAT NATIONAL DU COMMERCE EXTERIEUR DES CEREALES (SYNACOMEX). Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the preprinted text of this document, the original SYNACOMEX document shall prevail. BIMCO and SYNACOMEX assume no responsibility for any loss, damage or expense as a result of discrepancies between the original SYNACOMEX document and this computer generated document.

## PART II
## "SYNACOMEX 2000" Continent Grain Charterparty

shall have effect subject to the provisions of the Hague Rules 247
contained in the International Convention for the Unification 248
of certain rules relating to Bills of Lading, dated Brussels 249
the 25th August 1924, as enacted in the country of shipment. 250
These rules shall apply to any Bill of Lading issued under 251
this Charter Party. 252
When no such enactment is in force in the country of 253
shipment, the corresponding legislation of the country of 254
destination shall apply, but in respect of shipments to which 255
no such enactments are compulsorily applicable, the terms 256
of the said Convention shall apply. 257
In trades where the International Brussels Convention 1924 258
as amended by the Protocol signed at Brussels on February 259
23rd, 1968 - The Hague - Visby Rules - apply compulsorily, 260
the provisions of the respective legislation shall apply. 261
The Owners shall in no case be responsible for loss of or 262
damage to cargo howsoever arising prior to loading into 263
and after discharge from the Vessel. 264
Save to the extent otherwise in this Charter Party expressly 265
provided, neither party shall be responsible for any loss or 266
damage or delay or failure in performance hereunder, 267
resulting from Act of God, war, civil commotion, quarantine, 268
strikes, lockouts, arrest or restraint of princes, rulers and 269
peoples or any other event whatsoever which cannot be 270
avoided or guarded against. 271

**23. Amended General Ice Clause** 272
**Port of Loading** 273
a) In the event of the loading port being inaccessible by 274
reason of ice when Vessel is ready to proceed from her last 275
port or at any time during the voyage or on Vessel's arrival 276
or in case frost sets in after Vessel's arrival, the Master for 277
fear of being frozen in is at liberty to leave without cargo, 278
and this Charter Party shall be null and void. 279
b) If during the loading the Master, for fear of Vessel being 280
frozen in, deems it advisable to leave, he has liberty to do 281
so with what cargo he has on board and to proceed to any 282
other port or ports with option of completing cargo for 283
Owner's benefit to any port or ports including port of 284
discharge. Any part cargo thus loaded under this Charter 285
Party to be forwarded to destination at Vessel's expense 286
but against payment of freight, provided that no extra 287
expenses be thereby caused to the Receivers, freight being 288
paid on quantity delivered (in proportion if lumpsum), all 289
other conditions as per Charter Party. 290
c) In case of more than one loading port, and if one or more 291
of the ports are closed by ice, the Master or Owners to be 292
at liberty either to load the part cargo at the open port and 293
fill up elsewhere for their own account as under section b) 294
or to declare this Charter Party null and void unless 295
Charterers agree to load full cargo at the open port. 296
**Port of Discharge** 297
a) Should ice prevent Vessel from reaching port of 298
discharge, Receivers shall have the option of keeping Vessel 299
waiting until the reopening of navigation and paying 300
demurrage, or of ordering the Vessel to a safe and 301
immediately accessible port where she can safely discharge 302
without risk of detention by ice. Such orders to be given 303
within 48 hours after Master or Owners have given notice 304
to Charterers of the impossibility of reaching port of 305
destination. 306
b) If during discharging the Master for fear of Vessel being 307
frozen in deems it advisable to leave, he has liberty to do 308
so with what cargo he has on board and to proceed to the 309
nearest accessible port where she can safely discharge. 310
c) On delivery of the cargo at such port, all conditions of 311
the Bill of Lading shall apply and Vessel shall receive the 312
same freight as if she had discharged at the original port of 313

destination, except that if the distance of the substituted 314
port exceeds 100 nautical miles, the freight on the cargo 315
delivered at the substituted port to be increased in 316
proportion. 317

**24. Amended Centrocon Strike Clause** 318
If the cargo cannot be loaded by reason of Riots, Civil 319
Commotions or of a Strike or Lockout of any class of 320
workmen essential to the loading of the cargo, or by reason 321
of obstructions or stoppages beyond the control of the 322
Charterers caused by Riots, Civil Commotions or a Strike 323
or Lockout on the Railways, or in the Docks, or other loading 324
places, or if the cargo cannot be discharged by reason of 325
Riots, Civil Commotions or of a Strike or Lockout of any 326
class of workmen essential to the discharge, the time for 327
loading or discharging, as the case may be, shall not count 328
during the continuance of such causes, provided that a 329
Strike or Lockout of the Shippers' and/or Receivers' men 330
shall not prevent demurrage accruing if by the use of 331
reasonable diligence they could have obtained other suitable 332
labour at rates current before the Strike or Lockout. 333
In case of any delay by reason of the before-mentioned 334
causes, no claim for damages or demurrage shall be made 335
by the Charterers / Receivers of the cargo, or Owners of 336
the Vessel. For the purpose, however, of settling despatch 337
money accounts, any time lost by the Vessel through any 338
of the above causes shall be counted as time used in loading 339
or discharging, as the case may be. 340

**25. General Average and New Jason Clause** 341
General average shall be adjusted according to the York- 342
Antwerp Rules 1994 or any subsequent modification thereof, 343
but where the adjustment is made in accordance with the 344
law and practice of the United States of America, the 345
following Clause shall apply: 346
"In the event of accident, danger, damage or disaster 347
before or after the commencement of the voyage, 348
resulting from any cause whatsoever, whether due to 349
negligence or not, for which, or for the consequence of 350
which, the carrier is not responsible, by statute, contract 351
or otherwise, the goods, shippers, consignees or owners 352
of the goods shall contribute with the carrier in general 353
average to the payment of any sacrifices, losses or 354
expenses of a general average nature that may be made 355
or incurred and shall pay salvage and special charges 356
incurred in respect of the goods. 357
If a salving ship is owned or operated by the carrier, 358
salvage shall be paid for as fully as if the said salving 359
ship or ships belonged to strangers. Such deposit as the 360
carrier or his Agents may deem sufficient to cover the 361
estimated contribution of the goods and any salvage and 362
special charges thereon shall, if required, be made by 363
the goods, shippers, consignees or owners of the goods 364
to the carrier before delivery." 365
and the Charterers shall procure that all Bills of Lading issued 366
under the Charter Party shall contain the same Clause. 367

**26. Both-to-Blame Collision Clause** 368
If the liability for any collision in which the Vessel is involved 369
while performing this Charter Party falls to be determined 370
in accordance with the laws of the United States of America, 371
the following Clause shall apply: 372
"If the ship comes into collision with another ship as a result 373
of the negligence of the other ship and any act, neglect or 374
default of the Master, mariner, pilot or the servants of the 375
carrier in the navigation or in the management of the ship, 376
the owners of the goods carried hereunder will indemnify 377
the carrier against all loss or liability to the other or non- 378
carrying ship or her owners in so far as such loss or liability 379
represents loss of, or damage to, or any claim whatsoever 380

This document is a computer generated SYNACOMEX 2000 form printed by authority of SYNDICAT NATIONAL DU COMMERCE EXTERIEUR DES CEREALES (SYNACOMEX). Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original SYNACOMEX document shall apply. BIMCO and SYNACOMEX assume no responsibility for any loss, damage or expense as a result of discrepancies between the original SYNACOMEX document and the computer generated document.

## PART II
### "SYNACOMEX 2000" Continent Grain Charterparty

of the owners of the said goods, paid or payable by the       381
other or non-carrying ship or her owners to the owners of     382
the said goods and set off, recouped or recovered by the      383
other or non-carrying ship or her owners as part of their     384
claim against the carrying ship or carrier.                   385
The foregoing provisions shall also apply where the           386
Owners, Operators or those in charge of any ship or ships     387
or objects other than, or in addition to, the colliding ships or  388
objects are at fault in respect to a collision or contact.    389
and the Charterers shall procure that all Bills of Lading issued  390
under this Charter Party shall contain the same Clause.       391

27. War risks ("Voywar 1993")                                 392
a) For the purpose of this Clause, the words:                 393
(i) "Owners" shall include the shipowners, bareboat           394
charterers, disponent owners, managers or other operators     395
who are charged with the management of the Vessel, and        396
the Master; and                                               397
(ii) "War Risks" shall include any war (whether actual or     398
threatened), act of war, civil war, hostilities, revolution,  399
rebellion, civil commotion, warlike operations, the laying of 400
mines (whether actual or reported), acts of piracy, acts of   401
terrorists, acts of hostility or malicious damage, blockades  402
(whether imposed against all vessels or imposed selectively   403
against vessels of certain flags or ownership, or against     404
certain cargoes or crews or otherwise howsoever), by any      405
person, body, terrorist or political group, or the Government 406
of any state whatsoever, which, in the reasonable judgement   407
of the Master, and/or the Owners, may be dangerous or are     408
likely to be or become dangerous to the Vessel, her cargo,    409
crew or other persons on board the Vessel.                    410
b) If at any time before the Vessel commences loading, it     411
appears that, in the reasonable judgement of the Master       412
and/or the Owners, performance of the Charter Party, or       413
any part of it, may expose, or is likely to expose, the Vessel,  414
her cargo, crew or other persons on board the Vessel to       415
War Risks, the Owners may give notice to the Charterers       416
cancelling this Charter Party, or may refuse to perform such  417
part of it as may expose, or may be likely to expose, the     418
Vessel, her cargo, crew or other persons on board the Vessel  419
to War Risks; provided always that if this Charter Party      420
provides that loading or discharging is to take place within a 421
range of ports, and at the port or ports nominated by the     422
Charterers the Vessel, her cargo, crew, or other persons      423
onboard the Vessel may be exposed, or may be likely to be     424
exposed, to War Risks, the Owners shall first require the     425
Charterers to nominate any other safe port which lies within  426
the range for loading or discharging, and may only cancel     427
this Charter Party if the Charterers shall not have nominated 428
such safe port or ports within 48 hours of receipt of notice of  429
such requirement.                                             430
c) The Owners shall not be required to continue to load       431
cargo for any voyage, or to sign Bills of Lading for any port  432
or place, or to proceed or continue on any voyage, or on      433
any part thereof, or to proceed through any canal or          434
waterway, or to proceed to or remain at any port or place     435
whatsoever, where it appears, either after the loading of     436
the cargo commences, or at any stage of the voyage            437
thereafter before the discharge of the cargo is completed,    438
that, in the reasonable judgement of the Master and/or the    439
Owners, the Vessel, her cargo (or any part thereof), crew     440
or other persons on board the Vessel (or any one or more      441
of them) may be, or are likely to be, exposed to War Risks.   442
If it should so appear, the Owners may by notice request      443
the Charterers to nominate a safe port for the discharge of   444
the cargo or any part thereof, and if within 48 hours of the  445
receipt of such notice, the Charterers shall not have         446

nominated such a port, the Owners may discharge the cargo     447
at any safe port of their choice (including the port of loading)  448
in complete fulfilment of the Charter Party. The Owners shall 449
be entitled to recover from the Charterers the extra expenses 450
of such discharge and, if the discharge takes place at any    451
port other than the loading port, to receive the full freight as  452
though the cargo had been carried to the discharging port     453
and if the extra distance exceeds 100 miles, to additional    454
freight which shall be the same percentage of the freight     455
contracted for as the percentage which the extra distance     456
represents to the distance of the normal and customary        457
route, the Owners having a lien on the cargo for such         458
expenses and freight.                                         459
d) If at any stage of the voyage after the loading of the     460
cargo commences, it appears that, in the reasonable           461
judgement of the Master and/or the Owners, the Vessel,        462
her cargo, crew or other persons on board the Vessel may      463
be, or are likely to be, exposed to War Risks on any part of  464
the route (including any canal or waterway) which is normally 465
and customarily used in a voyage of the nature contracted     466
for, and there is another longer route to the discharging     467
port, the Owners shall give notice to the Charterers that     468
this route will be taken. In this event the Owners shall be   469
entitled, if the total extra distance exceeds 100 miles, to   470
additional freight which shall be the same percentage of      471
the freight contracted for as the percentage which the extra  472
distance represents to the distance of the normal and         473
customary route.                                              474
e) The Vessel shall have liberty:-                            475
(i) to comply with all orders, directions, recommendations    476
or advice as to departure, arrival, routes, sailing in convoy, 477
ports of call, stoppages, destinations, discharge of cargo,   478
delivery or in any way whatsoever which are given by the      479
Government of the Nation under whose flag the Vessel sails,   480
or other Government to whose laws the Owners are subject,     481
or any other Government which so requires, or any body or     482
group acting with the power to compel compliance with their   483
orders or directions;                                         484
(ii) to comply with the orders, directions or recom-          485
mendations of any war risks underwriters who have the         486
authority to give the same under the terms of the war risks   487
insurance;                                                    488
(iii) to comply with the terms of any resolution of the Security  489
Council of the United Nations, any directives of the European 490
Community, the effective orders of any other Supranational    491
body which has the right to issue and give the same, and      492
with national laws aimed at enforcing the same to which       493
the Owners are subject, and to obey the orders and            494
directions of those who are charged with their enforcement;   495
(iv) to discharge at any other port any cargo or part thereof 496
which may render the Vessel liable to confiscation as a       497
contraband carrier;                                           498
(v) to call at any other port to change the crew or any part  499
thereof or other persons on board the Vessel when there is    500
reason to believe that they may be subject to internment,     501
imprisonment or other sanctions;                              502
(vi) where cargo has not been loaded or has been              503
discharged by the Owners under any provisions of this         504
Clause, to load other cargo for the Owners' own benefit       505
and carry it to any other port or ports whatsoever, whether   506
backwards or forwards or in a contrary direction to the       507
ordinary or customary route.                                  508
f) If in compliance with any of the provisions of sub-clauses 509
b) to e) of this Clause anything is done or not done, such    510
shall not be deemed to be a deviation, but shall be           511
considered as due fulfilment of the Charter Party.            512

This document is a computer generated SYNACOMEX 2000 form printed by authority of SYNDICAT NATIONAL DU COMMERCE EXTERIEUR DES CEREALES (SYNACOMEX). Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the preprinted text of this document which is not clearly visible, the text of the original SYNACOMEX document shall apply. BIMCO and SYNACOMEX assume no responsibility for any loss, damage or expense as a result of discrepancies between the original SYNACOMEX document and this computer generated document.

MV HONG PROSPERITY/SUNDERSONS CP DD 08TH AUGUST 2007

**Clause 30**
M/V HONG PROSPERITY

| | |
|---|---|
| Ex name | : National Pride |
| Type | : Multi-purpose Cargo Ship |
| Port of Registry | : KINGSTOWN |
| Class | : American Bureau of Shipping |
| Year Built | : March 1981 |
| Builder | : Hitachi Shipbuilding and Engineering Co. Japan |
| Call Sign | : VRWC5 |
| Inmarsat-C ID No. | : 447760410 |
| Sat com. phone | : 762960165 |
| Sat com. fax | : 762960166 |
| DWT Summer | : 19,409.00 mt |
| Gross Tonnage (GT) | : 13,228.00 |
| Net Tonnage (NT) | : 7,529.00 |
| Suez GRT | : 14,149.19 |
| Suez NRT | : 11,118.15 |
| Panama GRT | : 14,902 |
| Panama NRT | : 11,986 |
| LOA | : 163.06 m |
| LBP | : 152.00 m |
| Breadth, mld | : 23.10 m |
| Depth, mld | : 14.10 m |
| Draft summer | : 9.921 m |

Speed about 14.5knots on 26.5 IFO (380 CST) + 2.0 mt MDO
Speed consumption is based on clean and smooth bottom, even keel, deep and currentless water with sea temperature of max. 28 degrees celsius, wind max. Beaufort 3.

Port Consumption :
Idle     : C about 1.0 mt IFO 380 CST + about 1.5 mt MDO
Working 24 hours : C about 1.0 mt IFO 380 CST + about 2.5 mt MDO

IFO Tank Capacity   : 1,793 M3 @ 100% full
MDO Tank Capacity   : 261 M3 @ 100% full
Fuel Grade/ Specs   : IFO380cst   RMG35,ISO8217,1996
                    : MDO,DMB,ISO8217,1996

HOLD DIMENSIONS (in meter):
Cargo Hold # 1:

| | Length | Width (fwd) | Width (aft) | Depth | Depth (hatchway) |
|---|---|---|---|---|---|
| (bulkhead) | | | | | |
| LH | 19.0 | 5.6 | 15.6 | 5.4 | 6.0 |
| TD | 19.0 | 7.0 | 19.7 | 5.4 | 4.0 |

Cargo Hold # 2:

| | Length | Width (fwd) | Width (aft) | Depth | Depth (hatchway) |
|---|---|---|---|---|---|
| (bulkhead) | | | | | |
| LH | 24.0 | 13.4 | 22.0 | 8.0 | 9.2 |
| TD | 24.0 | 20.0 | 22.6 | 5.4 | 4.0 |

Cargo Hold # 3:

| | Length | Width (fwd) | Width (aft) | Depth | Depth (hatchway) |
|---|---|---|---|---|---|
| (bulkhead) | | | | | |
| LH | 24.8 | 18.6 | 18.6 | 8.0 | 9.2 |
| TD | 24.8 | 22.6 | 22.6 | 5.4 | 4.0 |

Cargo Hold # 4:

| | Length | Width | Width | Depth | Depth |
|---|---|---|---|---|---|

MV HONG PROSPERITY/SUNDERSONS CP DD 08TH AUGUST 2007

|  | Length | Width (fwd) | Width (aft) | Depth (bulkhead) | Depth (hatchway) |
|---|---|---|---|---|---|
| LH | 24.0 | 18.6 | 18.6 | 9.0 | 8.2 |
| TD | 24.0 | 22.6 | 22.6 | 5.4 | 4.0 |

Cargo Hold # 5:

|  | Length | Width (fwd) | Width (aft) | Depth (bulkhead) | Depth (hatchway) |
|---|---|---|---|---|---|
| LH | 17.4 | 19.6 | 12.4 | 9.0 | 8.2 |
| TD | 17.4 | 22.6 | 22.2 | 5.4 | 4.0 |

(Note: the TD bulkhead height is applicable to the wings only. The height fwd and aft of the tweendeck opening is restricted by the tweendeck hatch cover stoppers)

Number of Decks    : 2
Number of Holds    : 5
Number of Hatches  : 9
    Hold # 1 - Single Hatch, Tweendecker
    Hold # 2 to 5 - Twin Hatches, Tweendecker
    Hold # 4 - Has longitudinal bulkhead on lower hold, Tweendecker
    Hold # 1, 2, 3 & 5 lower holds have supporting pillars amidships

CUBIC CAPACITY:

Total (Grain) : 28,727.00 cu.m
      (Bale)  : 27,470.00 cu.m

Cubic capacity each hold (2nd deck hatch cover closed)

|  | Grain | Bale |
|---|---|---|
| LH # 1 | 1,453 | 1,345 cu.m |
| LH # 2 | 4,485 | 4,239 cu.m |
| LH # 3 | 3,970 | 3,921 cu.m |
| LH # 4 | 3,837 | 3,785 cu.m |
| LH # 5 | 3,172 | 2,957 cu.m |
| TD # 1 | 1,462 | 1,388 cu.m |
| TD # 2 | 2,730 | 2,610 cu.m |
| TD # 3 | 2,838 | 2,703 cu.m |
| TD # 4 | 2,778 | 2,653 cu.m |
| TD # 5 | 2,001 | 1,899 cu.m |

Cubic capacity each hold (2nd deck hatch cover opened)

|  | Grain | Bale |
|---|---|---|
| HOLD # 1 | 2,697 cu.m | -- |
| HOLD # 2 | 6,884 cu.m | -- |
| HOLD # 3 | 6,482 cu.m | -- |
| HOLD # 4 | 6,335 cu.m | -- |
| HOLD # 5 | 4,870 cu.m | -- |

If loading grain in lower holds and tween decks, tween deck covers to be opened with shifting board fitted.

CONTAINER CAPACITY
(Nominal Intake):         210 teu Deck
                          210 /A d20s
                          or
                          50 /Ad20s (fixed) + 80 /A d40s
- or combination
                          No containers are allowed in Holds