BROWN GAVALAS & FROMM LLP
Attorneys for Plaintiff
JALAPA SHIPPING LIMITED
355 Lexington Avenue
New York, New York 10017
212-983-8500

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
JALAPA SHIPPING LIMITED,

                    Plaintiffs,

    -against-

SUNDERSONS LTD., MILAN NIGERIA LTD.,
SIMRAN MEHER LTD., CONTI-AGRO
NIGERIA LTD. and VALECHHA HOLDINGS
LIMITED,

                Defendants.
-----------------------------------------------------------X

07 Civ 8715 (RJH)

**SECOND AMENDED**
**VERIFIED COMPLAINT**



Plaintiff, JALAPA SHIPPING LIMITED, by its attorneys, Brown Gavalas & Fromm

LLP, as and for its Second Amended Verified Complaint against Defendants, SUNDERSONS

LTD. ("Sundersons"), MILAN NIGERIA LTD. ("Milan Nigeria"), SIMRAN MEHER LTD.

("Simran Meher"), VALECHHA HOLDINGS LIMITED ("Valechha Holdings") and CONTI-

AGRO NIGERIA LTD. ("Conti-Agro") (hereinafter the "Defendants"), allege upon information

and belief as follows:

    1.    This is a case of admiralty and maritime jurisdiction, as hereinafter more fully

appears, and is an admiralty or maritime claim within the meaning of Rule 9(h) of the Federal

Rules of Civil Procedure.  The Court has jurisdiction under 28 U.S.C. § 1333.

    2.    At all material times, plaintiff, Jalapa Shipping Limited was, and now is, a foreign

corporation with an office and place of business at Charleston, Nevis, Federation of Saint Kitts

and Nevis and, at all relevant times, was the registered owner of the motor vessel LION
PRINCESS ("the Vessel")

3.    Upon information and belief, at all material times, defendant, Sundersons, was and
now is a foreign corporation with an office and place of business at 52A Kofo Abayomi Street,
Victoria Island, Lagos, Nigeria.

4.    Upon information and belief, at all material times, defendant, Milan Nigeria, was
and now is a foreign corporation with an office and place of business at Suites 7b & 8b, 50 Town
Range, Gibraltar and at 52A and 243 Kofo Abayomi Street, Victoria Island, Lagos, Nigeria.

5.    Upon information and belief, at all material times, defendant, Simran Meher was and
now is a foreign corporation with an office and place of business at Suits 7b & 8b, 50 Town
Range, Gibraltar and at 52A Kofo Abayomi Street, Victoria Island, Lagos, Nigeria.

6.    Upon information and belief, at all material times, defendant, Valechha Holdings,
was and now is a foreign corporation with an office and place of business at 52A Kofo Abayomi
Street, Victoria Island, Lagos, Nigeria.

7.    Upon information and belief, at all material times, defendant Conti-Agro was and
now is a foreign corporation with an office and place of business at 243 Kofo Abayomi Street,
Victoria Island, Lagos, Nigeria.

8.    On or about November 13, 2005, a charter party agreement was entered into by and
between plaintiff and DEOL Marine Services, New Delhi ("DEOL"), whereby plaintiff agreed to
let, and DEOL, as charterer, agreed to hire the Vessel for a voyage, under certain terms and
conditions, from Kandla, India to Lagos and Port Harcourt, Nigeria ("Charter Agreement").  On
or about November 26, 2005, plaintiff issued 10 bills of lading, Nos. KDL/LP-01 to KDL/LP-10,
with respect to cargo transported aboard the Vessel.  A copy of the Charter Agreement is

attached hereto as Exhibit "A."

9.    At all relevant times, defendant Milan was the receiver and/or consignee of the cargo evidenced by said bills of lading. The said bills of lading incorporated all of the terms of the Charter Agreement, including the arbitration clause therein and are therefore subject to the same arbitration clause.

10.    Box 25 and Clause 19 of the Charter Agreement contain a London arbitration clause which provides, in part, as follows:

> "This Charter Party shall be governed by and construed in accordance with English law and any dispute arising out of this Charter Party shall be referred to arbitration in London in accordance with the Arbitration Acts 1950 and 1979 or any statutory modification or re-enactment thereof for the time being in force."

11.    The Vessel arrived at the first discharge port, Lagos, Nigeria on or about January 2, 2006, and discharged its cargo of long-grain parboiled rice on or about February 1, 2006.

12.    At Lagos, the Defendants claimed damage to the cargo discharged at Lagos, and prevented the departure of the Vessel by blocking the necessary clearances. In addition, defendants made several threats to arrest the Vessel. With the Vessel now prevented from departing and with repeated threats of judicial arrest of the Vessel, Defendants demanded payment of $80,000 on grounds of alleged cargo shortage, despite the fact that Defendants knew or should have known that any shortages to cargo were due to the negligence or incompetence of local discharging stevedores, for which Plaintiff bears no responsibility whatsoever.

13.    Plaintiff made various offers to obtain a release of the Vessel pending adjudication, on the merits of the alleged cargo claim, including an offer to post a guarantee letter from Plaintiffs' insurer. Such guarantee letters are routinely offered and accepted in international shipping transactions and are considered good and acceptable security for claims.

14.    Despite Plaintiff's repeated and reasonable efforts, Defendants refused to accept

3

security in substitution of the continued detention of the Vessel and demanded resolution of the parties' dispute in Nigeria, in breach of the Defendants' obligation to submit all disputes between the parties to arbitration in London.

15.   With the Vessel wrongfully detained in Lagos, and with Defendants continuing to threaten the arrest of the Vessel in further breach of the binding London arbitration and refusing to release the Vessel in substitution for comparable security, Plaintiff was compelled to reach a settlement in the amount of $49,000

16.   Plaintiff's payment of $49,000 to Defendants was made under both economic and physical duress, and was procured due to Defendants' breach of the Charter Agreement in detaining the Vessel in Nigeria and seeking to compel Plaintiff to forego its rights under the Charter Agreement and applicable law.

17.   Defendants' attempt to pursue their claims against Plaintiff outside London, and their attempts to compel Plaintiff to agree to Nigerian jurisdiction or to pay the alleged claim, constitute a breach of contract, economic duress and oppressive and/or vexatious and/or bad faith conduct because:

> a.   the Plaintiff and its insurers have offered to secure Defendants' alleged claims with plaintiff's insurer's a guarantee letter with English law and arbitration; and
>
> b.   the sole purpose of the threats to arrest the Vessel and the Defendants' refusal to accept comparable substitute security was intended to compel and coerce Plaintiff, under extreme economic duress, to agree to Nigerian jurisdiction and law or into paying Defendants' claim by way of settlement.

18.   Plaintiff has incurred costs and losses as a result of the detention of the Vessel and the breaches of the Charter Agreement on the part of Defendants, their servants and agents, including load port and discharge port demurrage, detention charges, bunkers consumed during the detention period, daily running expenses and earning losses, in the principal amount of

$251,125.78, as best as can be determined at the present time.

19.  On information and belief, the Defendants are all affiliated entities operating under the name "Milan Group" and, at all relevant times held, and continue to hold, themselves out to the world as being "associated" members of the "Milan Group," an international trading group based in Lagos, Nigeria.

20.  On information and belief, all the members of the "Milan Group," including the Defendants herein, share officers, directors and personnel, as well as common offices and addresses in, among other places, Lagos, Nigeria.

21.  Upon information and belief, the said members of the Milan Group, including Defendants herein, transact business as the "Milan Group," and not individually, and said members are jointly and severally liable for the obligations of each other member of the Milan Group.

22.  On information and belief, Milan Nigeria makes payments on behalf of the other Defendants.  For example, in September 2007, a bank transfer was originated by Milan Nigeria for Conti-Agro's charter of the M/V HONG PROSPERITY even though Milan Nigeria claims it had no interest in the charter.

23.  On information and belief, all the Defendants are controlled and operated by Milan Nigeria from the identical address in Lagos, Nigeria.

24.  On information and belief, all the Defendants are controlled and operated by the Valechha family.  In addition, the "legal representative/business owner" of Conti-Agro is Ramesh Valechha, who communicates with third parties in commercial matters using the email account of the "Milan Group."

25.  Upon information and belief, defendant Milan Nigeria exercises such complete

domination and control over defendants Sundersons, Conti-Agro, Simran Meher, and Valechha, and/or disregarded Sundersons's, Conti-Agro's, Simran Meher's and Valechha's corporate form, and/or conducted the business and operations of Sundersons, Conti-Agro, Simran Meher and Valechha as if the same were Milan Nigeria's own, that adherence to the fiction of the separate existence of the Defendants as entities distinct from one another and/or the separate existence of defendants Sundersons, Milan Nigeria, Conti-Agro, Simran Meher and Valechha as distinct from each other, would permit an abuse of the corporate privilege and would sanction fraud and promote injustice.

26.    Upon information and belief, there exists, and at all times herein mentioned there existed, a unity of interest and ownership between and amongst Defendants, such that any individuality and separateness between said Defendants have ceased, and Defendants, and each of them, are the alter egos of each other.

27.    Upon information and belief, the said members of the Milan Group, including Defendants herein, are guarantors of the obligations of each individual member of the Milan Group.

28.    On information and belief, defendants Conti-Agro and Milan Nigeria hold themselves out publicly as associated companies with virtually identical product lines, including raw cashew nuts.

29.    In accordance with a binding arbitration clause in the Charter Agreement and in the bills of lading, Plaintiff will commence arbitration proceedings in London, England.

30.    This action is in aid of said arbitration proceedings, as aforesaid, in accordance with 9 U.S.C. § 8. Plaintiff seeks to obtain adequate security to satisfy a potential London arbitration award in Plaintiffs' favor.

31.  Plaintiff sues on its own behalf, and as agent and trustee on behalf of any other persons or parties who may now have, or hereinafter acquire, an interest in this action.

32.  Insofar as legal costs and attorneys' fees are routinely awarded to the prevailing party in London arbitration proceedings, Plaintiff also seeks to secure claims for interest and anticipated legal costs and attorneys fees.  As best as can now be estimated, Plaintiff expects to recover the following amounts in the London arbitration:

| | | |
|---|---|---|
| a. | On the principal claim | $251,125.78 |
| b. | Interest at 6% per annum, compounded quarterly for 3 years | $49,124.77 |
| c. | Anticipated Recoverable Costs (arbitrators' fees, attorneys' fees, etc.) | $100,000 |
| | TOTAL | $400,250.55 |

28.  Upon information and belief, Defendants cannot be found within the District, within the meaning of Supplemental Rule B of the Federal Rules Civil Procedure, but are believed to have or will have during the pendency of this action assets within this District, specifically including cash, funds, freight, hire, accounts and other property, in the hands of garnishees in the District including but not limited to American Express Bank, Ltd.; ABN-AMRO Bank; Bank of Tokyo Mitsubishi UFJ Ltd.; Barclays Bank; Calyon; Standard Chartered PLC; HSBC Bank; Bank of America; BNP New York; Bank of New York; J.P. Morgan Chase; Deutsche Bank; Citibank; Mashreq Bank; Bank of China; UBS AG; and Wachovia Bank, which are believed to be due and owing to the Defendants.

WHEREFORE Plaintiffs pray:

A.  That process in due form of law according to the practice of this Court in admiralty and maritime jurisdiction issue against the Defendants, citing them to appear and answer under

oath all and singular the matters alleged in the Second Amended Verified Complaint;

B. That since the Defendants cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of the Court to issue Process of Attachment and Garnishment, pursuant to Rule B of the Supplemental Admiralty Rules and the United States Arbitration Act, 9 U.S.C §§ 1 and 8, attaching all cash, goods, chattels, letters of credit, bills of lading, effects, debts and monies, tangible or intangible, or any other funds held by any garnishee, including American Express Bank, Ltd.; ABN-AMRO Bank; Bank of Tokyo Mitsubishi UFJ Ltd.; Barclays Bank; Calyon; Standard Chartered PLC; HSBC Bank; Bank of America; BNP New York; Bank of New York; J.P. Morgan Chase; Deutsche Bank; Citibank; Mashreq Bank; Bank of China; UBS AG; and Wachovia Bank, which are due and owing to the Defendants, in the amount of $400,250.55, to secure the Plaintiffs' claim, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B answer the matters alleged;

C. That this action be stayed and this Court retain jurisdiction over this matter through the entry of any judgment or award, and any appeals thereof; and

D.  That Plaintiffs have such other, further and different relief as this Court may deem just and proper.

Dated: New York, New York
       March 10, 2008

                                      BROWN GAVALAS & FROMM LLP
                                      Attorneys for Plaintiff
                                      JALAPA SHIPPING LIMITED

By: _____
                    Peter Skoufalos (PS-0105)
                    355 Lexington Avenue
                    New York, New York 10017
                    212-983-8500

**VERIFICATION**

STATE OF NEW YORK    )
                       : ss.:

COUNTY OF NEW YORK  )

PETER SKOUFALOS, being duly sworn, deposes and says:

1.      I am a member of the bar of this Honorable Court and of the firm of Brown Gavalas & Fromm LLP, attorneys for Plaintiff.

2.      I have read the foregoing Second Amended Verified Complaint and I believe the contents thereof are true.

3.      The reason this Verification is made by deponent and not by Plaintiff is that Plaintiff is a foreign corporation, no officer or director of which is within this jurisdiction.

4.      The sources of my information and belief are documents provided to me and statements made to me by representatives of the Plaintiff.

PETER SKOUFALOS

Sworn to before me this
10th day of March, 2008

Notary Public

EVAN B. RUDNICKI
Notary Public of the State of New York
No. 02RU6142314
Qualified in Rockland County
Term Expires March 13, 2012

10

# EXHIBIT "A"

| | |
|---|---|
| 1.  Shipbroker<br><br>PT. SIMPSON SPENCE & YOUNG INDONESIA<br>S. Widjojo Centre 3rd Floor<br>Jl. Jend Sudirman Kav 71  Jakarta 12190 - Indonesia | RECOMMENDED<br>THE BALTIC AND INTERNATIONAL MARITIME COUNCIL<br>UNIFORM GENERAL CHARTER (AS REVISED 1922, 1976 and 1994<br>(To be used for trades for which no specially approved form is in force)<br>CODE NAME "GENCON"                                           Part I |
| | 2.  Place and date<br>JAKARTA, 13th NOVEMBER 2005 |
| 3.  Owners/Place of business (Clause 1)<br>LION SHIPPING PTY LTD<br>LEVEL 5, 5-9 HARBOUR VIEW CRESCENT<br>MILSONS POINT SYDNEY NSW 2061 - AUSTRALIA | 4.  Charterers/Place of business (Clause 1)<br>DEOL MARINE SERVICES, NEW DELHI<br>SAMARAT COMMERCIAL COMPLEX<br>RING ROAD – NEW DELHI |
| 5.  Vessel's name (Clause 1)<br>M.V. LION PRINCESS | 6.  GRT/NRT (Clause 1)<br>10,753 / 6,129 MT |
| 7.  Deadweight cargo carrying capacity in tons (abt.) (Clause 1)<br><br>17,700 MT  ON 9.279 M | 8.  Present position (Clause 1)<br><br>TRADING |
| 9.  Expected ready to load (abt.) (Clause 1)<br>16TH NOVEMBER 2005 | |
| 10.  Loading port or place(s) (Clause 1)<br><br>1-2 SAFE BERTHS KANDLA, INDIA | 11.  Discharging port(s) or place(s) (Clause 1)<br>1/2 SB 1/2 SP PORT APAPPA OR TINCAN AND PORT HARCOURT,<br>NIGERIA |
| 12.  Cargo (also state quantity and margin in Owners' option.  If agreed; if full and complete cargo not agreed state "part cargo") (Clause 1)<br><br>MIN 14,750 MT UP TO FULL VESSEL CAPACITY OF BAGGED RICE SUBJECT TO STOWAGE FACTOR | |
| 13.  Freight rate (also state if payable on delivered or intaken<br>quantity) (Clause 4)<br><br>USD 53.25 PMT FIOST BSS 1/2 WITH FREE DA AT DISCH PORTS | 14.  Freight payment (State currency and method of payment; also<br>beneficiary and bank account) (Clause 4)<br><br>SEE RIDER CLAUSE 29 |
| 15.  State if vessel's cargo handling gear shall not be used (Cl..5) | 16.  Laytime (if separate laytime for load. and disch. is agreed, fill in a) and b)<br>If total laytime for load. and disch. (fill in c) only) (Cl. 6)<br>a)  Laytime for loading<br>2000MT PWWD SHEX EIU SAT NN MON 08 CL<br>b)  Laytime for discharging<br>1000MT PWWD SHEX EIU FRI 1700HRS NN MON 08 CL<br>c)  Total laytime for loading and discharging |
| 17.  Shippers (state name and address) (Clause 6) | |
| 18.  Agents (loading) (Clause 6)<br>SEE RIDER CLAUSE 49 | |
| Agents (discharging) (Clause 6)<br>SEE RIDER CLAUSE 49 | |
| 20.  Demurrage rate (Loading and discharging) (Clause 7)<br><br>USD 8,500 PER DAY /DHD WTS BENDS LAYTIME NON-REVERSIBLE | 21.  Cancelling date (Clause 10)<br>20 NOVEMBER 2005<br>General Average to be adjusted at (Cl. 12)<br>LONDON – ENGLISH LAW |
| 23.  Freight Tax (state if for Owners account – Cl 13 c)<br>SEE RIDER CLAUSE 38 AND 48 | 24.  Brokerage commission and to whom payable (Clause 14)<br><br>2.50PCT ADDRESS COMMISSION + 1.25PCT BRISK MARINE +<br>1.25PCT SSY JAKARTA |
| 25.  Law and Arbitration (state 19 (a), 19 (b) or 19 (c) of Cl. 19; if 19 (c)<br>agreed also state Place of Arbitration – if not filled in Cl.19 (a) shall apply<br>(Cl.19)<br>LONDON – ENGLISH LAW TO APPLY | |
| (a)  State maximum amount for small claims/shortened arbitration (Cl.19) | 26.  Additional clauses covering special provisions, if agreed<br><br>RIDER CLAUSES 20 – 61  INCLUDED |

It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter which shall include Part I as well as Part II.  In the event of a conflict of conditions, the provisions of Part I shall prevail over those of Part II to the extent of such conflict.

| Signature (Owners) | Signature (Charterers) |
|---|---|
| <br><br><br>LION SHIPPING PTY LTD | <br><br><br>DEOL MARINE SERVICES |

## PART II
### "Gencon" Charter (As Revised 1922, 1976 and 1994)

1. It is agreed between the party mentioned in Box 3 as the Owners of the Vessel named in Box 5, of the GT/NT indicated in Box 6 and carrying about the number of metric tons of deadweight capacity all told on summer loadline stated in Box 7, now in position as stated in Box 8 and expected ready to load under this Charter Party about the date indicated in Box 9, and the party mentioned as the Charterers in Box 4 that: 6
The said Vessel shall, as soon as her prior commitments have been completed, proceed to the loading port(s) or place(s) stated in Box 10 or so near thereto as she may safely get and lie always afloat, and there load a full and complete cargo (if shipment of deck cargo agreed same to be at the Charterers' risk and responsibility) as stated in Box 12, which the Charterers bind themselves to ship, and being so loaded the Vessel shall proceed to the discharging port(s) or place(s) stated in Box 11 as ordered on signing Bills of Lading, or so near thereto as she may safely get and lie always afloat, and there deliver the cargo. 14

2. Owners' Responsibility Clause 15
The Owners are to be responsible for loss of or damage to the goods or for delay in delivery of the goods only in case the loss, damage or delay has been caused by personal want of due diligence on the part of the Owners or their Manager to make the Vessel in all respects seaworthy and to secure that she is properly manned, equipped and supplied, or by the personal act or default of the Owners or their Manager. 21
And the Owners are not responsible for loss, damage or delay arising from any other cause whatsoever, even from the neglect or default of the Master or crew or some other person employed by the Owners on board or ashore for whose acts they would, but for this Clause, be responsible, or from unseaworthiness of the Vessel whether existing at the time of shipment or at the commencement of the voyage or at any time whatsoever. 27

3. Deviation Clause 28
The Vessel has liberty to call at any port or ports in any order, for any purpose, to sail without pilots, to tow and/or assist Vessels in all situations, and also to deviate for the purpose of saving life and/or property. 31

4. Payment of Freight 32
(a) The freight at the rate stated in Box 13 shall be paid in cash calculated on the intaken quantity of cargo. 34
(b) Prepaid. If according to Box 13 freight is to be paid on shipment, it shall be deemed earned and non-returnable, Vessel and/or cargo lost or not lost. Neither the Owners nor their agents shall be required to sign or endorse bills of lading showing freight prepaid unless the freight due to the Owners has actually been paid. 39
(c) On delivery. If according to Box 13 freight, or part thereof, is payable at destination it shall not be deemed earned until the cargo is thus delivered. Notwithstanding the provisions under (a), if freight or part thereof is payable on delivery of the cargo the Charterers shall have the option of paying the freight on delivered weight/quantity provided such option is declared before breaking bulk and the weight/quantity can be ascertained by official weighing machine, joint draft survey or tally. 45
Cash for Vessel's ordinary disbursements at the port of loading to be advanced by the Charterers, if required at highest current rate of exchange, subject to two (2) per cent to cover insurance and other expenses. 49

5. Loading/Discharging 50
(a) Costs/Risks 51
The cargo shall be brought into the holds, loaded, stowed and/or trimmed, tallied, lashed and/or secured and taken from the holds and discharged by the Charterers, free of any risk, liability and expense whatsoever to the Owners. The Charterers shall provide and lay all dunnage material as required for the proper stowage and protection of the cargo on board, the Owners allowing the use of all dunnage available on board. The Charterers shall be responsible for and pay the cost of removing their dunnage after discharge of the cargo under this Charter Party and time to count until dunnage has been removed. 60
(b) Cargo Handling Gear 61
Unless the Vessel is gearless or unless it has been agreed between the parties that the Vessel's gear shall not be used and stated as such in Box 15, the Owners shall throughout the duration of loading/discharging give free use of the Vessel's cargo handling gear and of sufficient motive power to operate all such cargo handling gear. All equipment to be in good working order. Unless caused by negligence of the stevedores, time lost by breakdown of the Vessel's cargo handling gear or motive power - pro rata the total number of cranes/winches required at that time for the loading/discharge of cargo under this Charter Party - shall not count as laytime or time on demurrage. On request the Owners shall provide free of charge cranemen/winchmen from the crew to operate the Vessel's cargo handling gear, unless local regulations prohibit this, in which latter event shore labourers shall be for the account of the Charterers. Cranemen/winchmen shall be under the Charterers' risk and responsibility and as stevedores to be deemed as their servants but shall always work under the supervision of the Master. 75
(c) Stevedore Damage 76
The Charterers shall be responsible for damage (beyond ordinary wear and tear) to any part of the Vessel caused by Stevedores. Such damage shall be notified as soon as reasonably possible by the Master to the Charterers or their agents and to their Stevedores, failing which the Charterers shall not be held responsible. The Master shall endeavour to obtain the Stevedores' written acknowledgement of liability. 82

The Charterers are obliged to repair any stevedore damage prior to completion of the voyage, but must repair stevedore damage affecting the Vessel's seaworthiness or class before the Vessel sails from the port where such damage was caused or found. All additional expenses incurred shall be for the account of the Charterers and any time lost shall be for the account of and shall be paid to the Owners by the Charterers at the demurrage rate. 88

6. Laytime 89
*(a) Separate laytime for loading and discharging 90
The cargo shall be loaded within the number of running days/hours as indicated in Box 16, weather permitting, Sundays and holidays excepted, unless used in which event time used shall count. 93
The cargo shall be discharged within the number of running days/hours as indicated in Box 16, weather permitting, Sundays and holidays excepted, unless used, in which event time used shall count. 96
*(b) Total laytime for loading and discharging 97
The cargo shall be loaded and discharged within the number of total running days/hours as indicated in Box 16, weather permitting, Sundays and holidays excepted, unless used, in which event time used shall count. 100
(c) Commencement of laytime (loading and discharging) 101
Laytime for loading and discharging shall commence at 13.00 hours, if notice of readiness is given up to and including 12.00 hours, and at 06.00 hours next working day if notice given during office hours after 12.00 hours. Notice of readiness at loading port to be given to the Shippers named in Box 17 or if not named, to the Charterers or their agents named in Box 18. Notice of readiness at the discharging port to be given to the Receivers or, if not known, to the Charterers or their agents named in Box 19. 107
If the loading/discharging berth is not available on the Vessel's arrival at or off the port of loading/discharging, the Vessel shall be entitled to give notice of readiness within ordinary office hours on arrival there, whether in free pratique or not, whether customs cleared or not. Laytime or time on demurrage shall then count as if she were in berth and in all respects ready for loading/discharging provided that the Master warrants that she is in fact ready in all respects. Time used in moving from the place of waiting to the loading/discharging berth shall not count as laytime. 114
If, after inspection, the Vessel is found not to be in all respects to load/discharge time lost after the discovery thereof until the Vessel is again ready to load/discharge shall not count as laytime. 117
Time used before commencement of laytime shall count. 120
* Indicate alternative (a) or (b) as agreed, in Box 16. 121

7. Demurrage 122
Demurrage at the loading and discharging port is payable by the Charterers at the rate stated in Box 20 in the manner stated in Box 20 per day or pro rata for any part of a day. Demurrage shall fall due day by day and shall be payable upon receipt of the Owners' invoice. 126
In the event the demurrage is not paid in accordance with the above, the Owners shall give the Charterers 96 running hours written notice to rectify the failure. If the demurrage is not paid at the expiration of this time limit and if the vessel is in or at the loading port, the Owners are entitled at any time to terminate the Charter Party and claim damages for any losses caused thereby. 131

8. Lien Clause 132
The Owners shall have a lien on the cargo and on all sub-freights payable in respect of the cargo, for freight, deadfreight, demurrage, claims for damages and for all other amounts due under this Charter Party including costs of recovering same. 136

9. Cancelling Clause 137
(a) Should the Vessel not be ready to load (whether in berth or not) on the cancelling date indicated in Box 21, the Charterers shall have the option of cancelling the Charter Party. 139
(b) Should the Owners anticipate that, despite the exercise of due diligence, the Vessel will not be ready to load by the cancelling date, they shall notify the Charterers thereof without delay stating the expected date of the Vessel's readiness to load and asking whether the Charterers will exercise their option of cancelling the Charter Party, or agree to a new cancelling date. 144
Such option must be declared by the Charterers within 48 running hours after the receipt of the Owners' notice. If the Charterers do not exercise their option of cancelling, then this Charter Party shall be deemed to be amended such that the seventh day after the new readiness date stated in the Owners' notification to the Charterers shall be the new cancelling date. 150
The provisions of sub-clause (b) of this Clause shall operate only once, and in case of the Vessel's further delay, the Charterers shall have the option of cancelling the Charter Party as per sub-clause (a) of this Clause. 153

10. Bills of Lading 154
Bills of Lading shall be presented and signed by the Master as per the "Congenbill" Bill of Lading form, Edition 1994, without prejudice to this Charter Party, or by the Owners' agents provided written authority has been given by Owners to the agents, a copy of which is to be furnished to the Charterers. The Charterers shall indemnify the Owners against all consequences or liabilities that may arise from the signing of bills of lading as presented to the extent that the terms or contents of such bills of lading impose or result in the imposition of more onerous liabilities upon the Owners than those assumed by the Owners under this Charter Party. 165

## PART II
"Gencon" Charter (As Revised 1922, 1976 and 1994)

11. **Both-to-Blame Collision Clause**
If the vessel comes into collision with another vessel as a result of the negligence of the other vessel and any act, neglect or default of the Master, Mariner, Pilot or the servants of the Owners in the navigation or in the management of the Vessel, the owners of the cargo carried hereunder will indemnify the Owners against all loss or liability to the other or non-carrying vessel or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said cargo, paid or payable by the other or non-carrying vessel or her owners to the owners of said cargo and set-off, recouped or recovered by the other or non-carrying vessel or her owners as part of their claim against the carrying Vessel or the Owners. The foregoing provisions shall also apply where the owners, operators or those in charge of any vessel or vessels or objects other than, or in addition to, the colliding vessels or objects are at fault in respect of a collision or contact.

12. **General Average and New Jason Clause**
General Average shall be adjusted in London unless otherwise agreed in Box 22 according to York-Antwerp Rules 1994 and any subsequent modification thereof. Proprietors of cargo to pay the cargo's share in the general expenses even if same have been necessitated through neglect or default of the Owners' servants (see Clause 2).
If General Average is to be adjusted in accordance with the law and practice of the United States of America, the following Clause shall apply: "In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Owners are not responsible, by statute, contract or otherwise, the cargo shippers, consignees or the owners of the cargo shall contribute with the Owners in General Average to the payment of any sacrifices, losses or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo. If a salving vessel is owned or operated by the Owners, salvage shall be paid for as fully as if the said salving vessel or vessels belonged to strangers. Such deposit as the Owners, or their agents, may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the goods to the Owners before delivery".

13. **Taxes and Dues Clause**
(a) *On Vessel* - The Owners shall pay all dues, charges and taxes customarily levied on the Vessel, howsoever the amount thereof may be assessed.
(b) *On cargo* - The Charterers shall pay all dues, charges, duties and taxes customarily levied on the cargo, howsoever the amount thereof may be assessed.
(c) *On freight* - Unless otherwise agreed in Box 23, taxes levied on the freight shall be for the Charterers account. *SEE RIDER CLAUSE 38, 45*

14. **Agency**   *SEE RIDER CLAUSE 49*
In every case the Owners shall appoint their own Agent both at the port of loading and the port of discharge.

15. **Brokerage**
A brokerage commission at the rate stated in Box 24 on the freight, dead-freight and demurrage earned is due to the party mentioned in Box 24.
In case of non-execution 1/3 of the brokerage on the estimated amount of freight to be paid by the party responsible for such non-execution to the Brokers as indemnity for the latter's expenses and work. In case of more voyages the amount of indemnity to be agreed.

16. **General Strike Clause**
(a) If there is a strike or lock-out affecting or preventing the actual loading of the cargo, or any part of it, when the vessel is ready to proceed from her last port or at any time during the voyage to the port or ports of loading or after her arrival there, the Master or the Owners may ask the Charterers to declare, that they agree to reckon the laydays as if there were no strike or lock-out. Unless the Charterers have given such declaration in writing (by telegram, if necessary) within 24 hours, the Owners shall have option of cancelling this Charter Party. If part cargo has already been loaded, the Owners must proceed with same, (freight payable on loaded quantity only) having liberty to complete with other cargo on the way for their own account.
(b) If there is a strike or lock-out affecting or preventing the actual discharging of the cargo on or after the Vessel's arrival at or off port of discharge and same has not been settled within 48 hours, the Charterers shall have the option of keeping the Vessel waiting until such strike or lock-out is at an end against paying half demurrage after expiration of the time provided for discharging until the strike or lock-out terminates and thereafter full demurrage shall be payable until the completion of discharging is or ordering the Vessel to a safe port where she can safely discharge without risk of being detained by strike or lock-out. Such orders to be given within 48 hours after the Master or the Owners have given notice to the Charterers of the strike or lock-out affecting the discharge. On delivery of the cargo at such port all conditions of this Charter Party and of the Bill of Lading shall apply and the Vessel shall receive the same freight as if she had discharged at the original port of destination, except that if the distance to the substituted port exceeds 100 nautical miles, the freight on the cargo delivered at the substituted port to be increased in proportion.

(c) Except for the obligations described above, neither the Charterers nor the Owners shall be responsible for the consequences of any strikes or lock-outs preventing or affecting the actual loading or discharging of the cargo.

17. **War Risks ("Voywar 1993")**
(1) For the purpose of this Clause, the words:
  (a) The "Owners" shall include the shipowners, bareboat Charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and
  (b) "War Risks" shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all Vessels or imposed selectively against Vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgment of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.
(2) If at any time before the vessel commences loading, it appears that, in the reasonable judgment of the Master and/or the Owners, performance of the Contract of Carriage, or any part of it, may expose, or is likely to expose, the Vessel, her cargo, crew or other persons on board the Vessel to War Risks, the Owners may give notice to the Charterers cancelling this Contract of Carriage, or may refuse to perform such part of it as may expose, or may be likely to expose, the Vessel, her cargo, crew or other persons on board the vessel to war Risks; provided always that if this Contract of Carriage provides that loading or discharging is to take place within a range of ports, and at the port or ports nominated by the Charterers the Vessel, her cargo, crew or other persons onboard the vessel may be exposed, or may be likely to be exposed, to War Risks, the Owners shall first require the Charterers to nominate any other safe port which lies within the range for loading or discharging, and may only cancel this Contract of Carriage if the Charterers shall not have nominated such safe port or ports within 48 hours of receipt of notice of such requirement.
(3) The Owners shall not be required to continue to load cargo for any voyage, or to sign Bills of Lading for any port or place, or to proceed or continue on any voyage, or on any part thereof, or to proceed through any canal or waterway, or to proceed to or remain at any port or place whatsoever, where it appears, either after the loading of the cargo commences, or at any stage of the voyage thereafter before the discharge of the cargo is completed, that, in the reasonable judgment of the Master and/or the Owners, the Vessel, her cargo (or any part thereof), crew or other persons on board the Vessel (or any one or more of them) may be, or are likely to be, exposed to War Risks. If it should so appear, the Owners may by notice request the Charterers to nominate a safe port for the discharge of the cargo or any part thereof, and if within 48 hours of the receipt of such notice, the Charterers shall not have nominated such a port, the Owners may discharge the cargo at any safe port of their choice (including the port of loading) in complete fulfilment of the Contract of Carriage. The Owners shall be entitled to recover from the Charterers the extra expenses of such discharge and, if the discharge takes place at any port other than the loading port, to receive the full freight as though the cargo had been carried to the discharging port and if the extra distance exceeds 100 miles, to additional freight which shall be the same percentage of the freight contracted for as the percentage which the extra distance represents to the distance of the normal and customary route, the Owners having a lien on the cargo for such expenses and freight.
(4) If at any stage of the voyage after the loading of the cargo commences, it appears that, in the reasonable judgment of the Master and/or the Owners, the Vessel, her cargo, crew or other persons on board the Vessel may be, or are likely to be, exposed to War Risks on any part of the route (including any canal or waterway) which is normally and customarily used in a voyage of the nature contracted for, and there is another longer route to the discharging port, the Owners shall give notice to the Charterers that this route will be taken. In this event the Owners shall if the total extra distance exceeds 100 miles, to additional freight which shall be the same percentage of the freight contracted for as the percentage which the extra distance represents to the distance of the normal and customary route.
(5) The Vessel shall have liberty:
  (a) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery or in any way whatsoever which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government which so requires, or any body or group acting with the power to compel compliance with their orders or directions;
  (b) to comply with the orders, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;
  (c) to comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other Supranational body which has the right to issue and

PART II
"Gencon" Charter (As Revised 1922, 1976 and 1994)

give the same, and with national laws aimed at enforcing the same to which
the Owners are subject, and to obey the orders and directions of those who are
charged with their enforcement;                                                     328
(d)   to discharge at any other port any cargo or part thereof which may            329
render that Vessel liable to confiscation as a contraband carrier;                  330
(e)   to call at any times port to change the crew or any part thereof or other     331
persons on board the Vessel when there is reason to believe that they may           332
be subject to internment, imprisonment or other sanctions;                          333
(f)   where cargo has not been loaded or has been discharged by the                 334
Owners under any provisions of this Clause, to load other cargo for the             335
Owners own benefit and carry it to any other port or ports whatsoever,              336
whether backwards or forwards or in a contrary direction to the ordinary or         337
customary route.                                                                    338
6.   If in compliance with any of the provisions of sub-clauses (2) to (5) of this   339
Clause anything is done or not done, such shall not be deemed to be a               340
deviation, but shall be considered as due fulfilment of the Contract of             341
Carriage.                                                                           342
                                                                                    343
                                                                                    344

18.   General Ice Clause                                                            345
Port of Loading                                                                     346
(a)   In the event of the loading port being inaccessible by reason of ice when the  347
Vessel is ready to proceed from her last port or at any time during the voyage or   348
on the Vessel's arrival or in case frost sets in after the Vessel's arrival, the     349
Master for fear of being frozen in is at liberty to leave without cargo, and this    350
Charter Party shall be null and void.                                               351
(b)   If during loading the Master, for fear of the Vessel being frozen in, deems it   352
advisable to leave, he has liberty to do so with what cargo he has on board and     353
to proceed to any other port or ports with option of completing cargo for the       354
Owners' benefit for any port or ports including port of discharge. Any part cargo   355
thus loaded under this Charter Party to be forwarded to destination at the          356
Vessel's expense but against payment of freight, provided that no extra             357
expenses be thereby caused to the Charterers, freight being paid on quantity        358
delivered (in proportion if lumpsum), all other conditions as per this Charter      359
Party.                                                                              360
(c)   In case of more than one loading port, and if one or more of the ports are    361
closed by ice, the Master or the Owners to be at liberty either to load the part    362
cargo at the open port and fill up elsewhere for their own account as under         363
section (b) or to declare the Charter Party null and void unless the Charterers     364
agree to load full cargo at the open port.                                          365

Port of Discharge                                                                   366
(d)   Should ice prevent the Vessel from reaching port of discharge the             367
Charterers shall have the option of keeping the Vessel waiting until the re-        368
opening of navigation and paying demurrage or of ordering the Vessel to a safe      369
and immediately accessible port where she can safely discharge without risk of      370
detention by ice. Such orders to be given within 48 hours after the Master or the   371
Owners have given notice to the Charterers of the impossibility of reaching port    372
of destination.                                                                     373

(e)   If during discharging the Master for fear of the Vessel being frozen in deems   374
it advisable to leave, he has liberty to do so with what cargo he has on board and   375
to proceed to the nearest accessible port where she can safely discharge.           376

(c)   On delivery of the cargo at such port, all conditions of the Bill of Lading    377
shall apply and the Vessel shall receive the same freight as if she had             378
discharged at   the original port of destination, except that if the distance of the   379
substituted port exceeds 100 nautical miles, the freight on the cargo delivered     380
at the substituted port to be increased in proportion.                              381

19.   Law and Arbitration                                                           382
(a)   This Charter Party shall be governed by and construed in accordance           383
with English law and any dispute arising out of this Charter Party shall be         384
referred to arbitration in London in accordance with the Arbitration Acts 1950      385
and 1979 or any statutory modification or re-enactment thereof for the time         386
being in force. Unless the parties agree upon a sole arbitrator, one arbitrator     387
shall be appointed by each party and the arbitrators so appointed shall appoint a    388
third arbitrator, the decision of the three-man tribunal thus constituted or any    389
two of them, shall be final. On the receipt by one party of the nomination in       390
writing of the other party's arbitrator, that party shall appoint their arbitrator   391
within fourteen days, failing which, the decision of the single arbitrator          392
appointed shall be final.                                                           393

For disputes where the total amount claimed by either party does not exceed         394
the amount stated in Box 25** the arbitration shall be conducted in accordance      395
with the Small Claims Procedure of the London Maritime Arbitrators                  396
Association.                                                                         397

* (b) This Charter Party shall be governed by and construed in accordance with       398
Title 9 of the United States Code and the Maritime Law of the United States         399
and should any dispute arise out of this Charter Party, the matter in dispute       400
shall be referred to three persons at New York, one to be appointed by each of      401
the parties hereto, and the third by the two so chosen; their decision or that of    402
any two of them shall be final, and for purpose of enforcing any award, this        403
agreement may be made a rule of the Court. The proceedings shall be                 404
conducted in accordance with the rules of the Society of Maritime Arbitrators,      405
Inc.                                                                                406

For disputes where the total amount claimed by either party does not exceed         407
the amount stated in Box 25** the arbitration shall be conducted in accordance      408
with the Shortened Arbitration Procedure of the Society of Maritime                 409
Arbitrators, Inc.                                                                   410

*(c) Any dispute arising out of this Charter Party shall be referred to arbitration   411
at the place indicated in Box 25, subject to the procedures applicable there.        412
The laws of the place indicated in Box 25 shall govern this Charter Party.           413

(d)   If Box 25 in Part I is not filled in, sub-clause (a) of this Clause shall apply.   414

* (a), (b) and (c) are alternatives; indicate alternative agreed in Box 25.          415

** Where no figure is supplied in Box 25 in Part I, this provision only shall be      416
void but the other provisions of this Clause shall have full force and remain in      417
effect.

RIDER CLAUSES
M/V "LION PRINCESS" – C/P DATED 13TH NOVEMBER 2005
BAGGED RICE KANDLA/PORT APPAPA OR TINCAN AND PORT HARCOURT
A/C DEOL MARINE SERVICES

**Clause 20**

Receivers to undertake to deposit with agents (nominated by Charterers /Receivers) at port of discharging sufficient funds as to cover the vessel's disbursement. Such deposit to be done in good time as to avoid any delay of the vessel.

Any loss of time/delays because of Charterers failure to arrange above fund to be for Charterers A/C.

Charterers not responsible for Owners expenses in discharging ports any consequences arising out of such will be on Owners time/account.

Owners will appoint their protecting agents in all such cases looking after various Owners affairs.

**Clause 21.**

Shifting for 1/2 Good Safe berth(s) or Anchorage(s) to be for Owners' account. Any additional shifting to be for Charterers account and laytime to count both ends. Vessel to be left in seaworthy trim for shifting between berth(s)/port(s).

**Clause 22.**

It is agreed that natural separation of cargo is being provided by the vessel by means of her compartments. Tweendeck hatches to be absolutely tight to avoid any penetration and/or contamination of cargo. If separations required for cargo, same to be Owners' responsibility but to be for Charterers account. If separations required by Master for stability reasons, same to be for Owners' account.

**Clause 23.**

Cargo to be loaded in vessel's clear unobstructed mainholds only. All being clean available and suitable for Charterers intended cargo of bagged rice.

**Clause 24.**

Ship to be fully equipped for the natural ventilation of cargo. Master to secure adequate and efficient ventilation during the voyage to avoid any damage to the cargo. Vessel will be held responsible for any damage to the cargo caused by inadequate ventilation or caused by water through ventilators and leakage of water and/or oil from pipes and/or valves and/or tanks etc., on board, due to wear and tear of the above or any other cause. Owners shall be fully liable for caked, wet, mouldy bags howsoever arising. Owners to maintain a daily contemporaneous record of ventilation of cargo on board the vessel during the voyage until completion of discharge otherwise owners shall be liable for caking/wet damage to cargo. The vessel's ventilation records during the entire voyage until completion of discharge shall be provided to the receivers within 7 days of a written request.

RIDER CLAUSES
M/V "LION PRINCESS" – C/P DATED 13TH NOVEMBER 2005
BAGGED RICE KANDLA/PORT APPAPA OR TINCAN AND PORT HARCOURT
A/C DEOL MARINE SERVICES

**Clause 25.**
Vessel to have current valid cargo gear/winches certificates on board. Owners guarantee vessel to be able to work all gear, winches/derricks simultaneously at all times. Any time lost due to insufficient and/or inefficiency of vessel's gear in accordance with clause 13 to be deducted from laytime in relation to number of gangs working. If due to vessel's gear breakdown, Charterers/Receivers to engage shore crane with costs and time to be for Owners' account. But always subject to Owners/Masters' approval which is not to be unreasonably withheld. If shore cranes are engaged at Owners expense then laytime shall continue to run pro rata to the number of shore cranes used.

**Clause 26.**
Master to supply a stowage plan to Charterers or their agents prior to commencement of loading and to ensure that cargo is properly and safely dunnaged and stowed to withstand the voyage and be delivered in same condition as when shipped. Owners shall issue a certificate of safe and proper stow upon completion of loading otherwise owners shall be liable for damaged cargo due to caking/wetness.

**Clause 27.**
Vessel shall be warped, if required, alongside the loading/discharging appliance at Owners' risk and expense, but such time to count, unless warping is carried out during excepted periods. In case strong winds preventing safe warping alongside the loading/discharging appliances and tug assistance is advisable, any such tug assistance necessary to be for Charterers account.

**Clause 28.**
Vessel only to load cargo for which "Clean on Board" Bill(s) of Lading can be issued and signed by Master/Agents. "Clean Mates' Receipts" to be issued at the end of each loading period and to be surrendered to Charterers/Shippers agents. Bill(s) of Lading to be issued in strict conformity with Mate's Receipts. Master to have the right to reject any damaged bags and call for sound cargo to be loaded in it's place.

**Clause 29.**
Freight to be paid to :
**Freight Beneficiary / Bankers details**

Bank: ANZ BANK
Bank Address: 287 OLD NORTHERN ROAD, CASTLE HILL, NSW AUSTRALIA 2154
Account Name:  LION SHIPPING PTY LTD
BSB: 012 263
Account Number: 496922219
Tax File Number: 835165175

2

RIDER CLAUSES
M/V "LION PRINCESS" – C/P DATED 13TH NOVEMBER 2005
BAGGED RICE KANDLA/PORT APPAPA OR TINCAN AND PORT HARCOURT
A/C DEOL MARINE SERVICES

100 percent freight less commission to be paid within 3 banking days on completion loading and signing/releasing bill(s) of lading, Bill(s) of Lading marked 'Freight payable as per Charter Party dated 13TH November 2005'. If freight prepaid Bill(s) of Lading are required then same issued in exchange for first set after owners receive freight in their bank.

Demurrage/Despatch at load/disch port to be settled by the charterer within 20 (Twenty) days after submission of relevant load/disch port Timesheets,  SOF / NOR etc.

Freight is deemed to be earned upon completion of loading, ship cargo lost not lost.


Clause 30.
Loading Rate - Cargo to be loaded at the rate of 2,000mt per weather working day of 24 consecutive hours Saturdays Noon, Sundays, Mondays 0800 hours and holidays excluded even if used.


Clause 31.
Discharging rate – Cargo shall be discharged at the rate of 1,000mt per weather working day of 24 consecutive hours Friday 1700 hours, Saturdays, Sundays, Mondays 0800 hours and holidays excluded even if used.

Master to tender notice of readiness upon arrival at each discharge port and laytime to commence as per gencon clause 8 AM / 1 PM


Clause 32.
Bad weather must also fall under rainfall i.e. time not to count.


Clause 33.
Owners to allow fumigation on board the vessel free of cost to the Charterers as long as crew can stay on board, otherwise all cost for charterers account. Laytime to count in both cases.


Clause 34.
Upon sailing from the loading port, Master/Owners to advise Charterers and Shippers the exact quantity loaded and ETA at first or sole discharging port. Also notices to be given to Charterers and to actual port Agents, once advised by Charterers.

3

RIDER CLAUSES
M/V "LION PRINCESS" – C/P DATED 13TH NOVEMBER 2005
BAGGED RICE KANDLA/PORT APPAPA OR TINCAN AND PORT HARCOURT
A/C DEOL MARINE SERVICES

**Clause 35.**

If so requested Charterers agents may issue Bill(s) of Lading on behalf of Master, but always in strict conformity with mate's receipt under the supervision of Owners' protecting agents. Owners will appoint their own protecting agents who will hold authority for issuing Bill(s) of Lading.

**Clause 36.**

Prior sailing from loading port, Master/Owners to authorize agents/Charterers to sign Bill(s) of Lading on Master/Owners behalf in strict conformity with Mate's receipts without prejudice to this Charter Party.

**Clause 37.**

(i) The stevedores although appointed and paid for by Charterers, Shippers or Receivers or their agents to remain under the direction and control of the Master, who will be responsible for proper loading, stowage and discharging of the cargo and the seaworthiness of the vessel. Cargo to be stowed, loaded and discharged at the risk, liability of the Shipowners/ Disponent Owners. Any stevedore damage to the vessel to be settled directly between the Owners and Stevedores, But in case Owners/Master are not able to settle their claim with stevedore then charterers to assist Owners best possible way in settlement of such claim.

(ii) The quantity stated on the Bill(s) of Lading is to be conclusive evidence against the Shipowners/Disponent Owners (as appropriate) as to the number of bags of cargo shipped. To avoid any short landing claims owners will employ their P and I in conjunction with Shippers/Charterers tally to carry out tally of all cargo loaded and to seal all hatches on completion of loading in presence of Shippers/Charterers representative.

On arrival discharge port, prior commencement of discharge, in presence of both Owners P and I and Charterers' representative, hatch seals to be opened and once again a tally, during discharge to be carried out jointly by Owners P and I and Charterers, Master to ensure.

**Clause 38.**

Any dues/taxes on vessel/flag/nationality and /or freight to be for owners account. Any taxes/dues on cargo to be for Charterers account.

**Clause 39.**

Nothing herein stated is to be construed as a demise of the vessel to the Charterers. The Owners to remain responsible for the navigation of the vessel's personal injury. The Owners guarantee to maintain a full P & I cover for the duration of the Charter Party.

4

RIDER CLAUSES
M/V "LION PRINCESS" – C/P DATED 13TH NOVEMBER 2005
BAGGED RICE KANDLA/PORT APPAPA OR TINCAN AND PORT HARCOURT
A/C DEOL MARINE SERVICES

**Clause 40.**

Subject to agreed time extensions any Charter Party disputes must be made in writing one (1) year of final discharge and where this provision is not complied with the dispute shall be extinguished and ceased to exit.

**Clause 41.**

If the cargo is the property of a third party, Owners have the same responsibility as they would have if the cargo were the property of the Charterers.

**Clause 42.**
Vessel Description

MV LION PRINCESS
SINGLE DECKER BULK CARRIER
STBC 17700 DWT ON 9.279 M DRAFT
BLT 1978 JPN, TSUNEISHI SHIP
CLASS BV, SS/DD PASSED 3/2003
GRT/NRT 10753/6129
LOA/BM 146.010/22.300 M
4 HO 4 HA HCO STL PONTS
HA DIMNS: NO.1 13.6X9.6M - NOS.2/3/4 19.5X11.2M
ABT 785,959/755,716 CFT GRN/BLE
THOM DRKS 4/25
M.E. PIELSTICK IHI-PIELSTICK 12PC2-5V 7800 BHP
3 DAIH=CITSU 6DS-18 X 360KW 445V 60HZ AC
AVRG SPEED : ABT 11 KNOT ON ABT 10 MTS IFO + 2 MTS GO

VSL/MANAGERS ISM/ISPS CERTIFIED
TPC (SUMMER DRAFT): 27.3 MTS
TTOP STRENGTH 17 MTS PER SQ.M.
AUSTRALIAN HOLD LADDERS
CO2 FITTED
SOUTH OF ENGLAND PNI
NATURAL VENTILATION

GRAIN/BALE CAPACITY HOLDWISE:
GRN / BLE
NO.1 124,263 116,783 CFT
NO.2 220,351 212,695 CFT
NO.3 223,360 215,662 CFT
NO.4 217,985 210,576 CFT

ALL DETAILS ABOUT

5

RIDER CLAUSES
M/V "LION PRINCESS" – C/P DATED 13TH NOVEMBER 2005
BAGGED RICE KANDLA/PORT APPAPA OR TINCAN AND PORT HARCOURT
A/C DEOL MARINE SERVICES

**Clause 43.**
Dunnage/Mats/Craft Paper/Bamboo sticks to be for owners account.

**Clause 44.**
Tally – Shore side to be Charterers account same for ship side to be for Owners account. In the event of any loss or damage to cargo, determined at ship side tally, Owners shall instruct their surveyors' at discharge port to conduct joint survey with surveyors to ascertain precisely the nature, cause and extent of loss of damage.

**Clause 45.**
The Charter Party is governed by English law and any disputes arising out of this Charter unless the parties agree on a single arbitrator shall be referred to the final arbitration of two arbitrators in London. One to be appointed by each of the parties, with power to such arbitrators to appoint an umpire. The arbitrators including the umpire so appointed shall be members of the L.M.A.A. and whose rule shall apply. Any claim must be made in writing and Claimants arbitrator appointed within one (1) year of completion of discharge and where this provision is not complied with the claim shall be deemed to be waived and barred.

**Clause 46.**
All port expenses and disbursement of the vessel's call at the discharging port including but not limited to Nigerian anchorage dues and harbour dues, conservancy fee and any other taxes and dues on vessel, cargo or freight at the discharging port are for Charterers/Receivers' account. Charterers/Receivers undertake to ensure that the vessel's agent at the discharging port is placed with funds to meet these expenses. It is understood that the vessel owners remain responsible for payment of fresh water, laundry, shipchandler, vessel repairs ordered by the owners or owners husbandry if any.

**Clause 47.**
Charterers/Receivers guarantee that all Nigerian import and customs formalities for the importation of the cargo into Nigeria will be carried out prior to the arrival of the vessel at the discharging port and full Nigeria import duties for the cargo will be paid prior to the arrival of the vessel at the discharging port.
Failing which Charterers/Receivers will be responsible for all additional cost and time lost as a result and will reimburse Owners all additional cost incurred thereby.

**Clause 48.**
Any Income tax on freight shall be for Owners account and Charterers shall be in no way concerned with assessment, collection or payment.

6

RIDER CLAUSES
M/V "LION PRINCESS" – C/P DATED 13TH NOVEMBER 2005
BAGGED RICE KANDLA/PORT APPAPA OR TINCAN AND PORT HARCOURT
A/C DEOL MARINE SERVICES

**Clause 49.**

Charterers agent at loadport.

TRINITY SHIPPING & ALLIED SERVICES PVT. LTD.
PLOT NO 46, SECTOR 1-A, GANDHIDHAM
KUTCH 370201
TEL: 91- 2836 -223703, 230910, 230911
FAX; 91- 2836 - 252060
EMAIL: trinity1@wilnetonline.net ; trinity1@icenet.net
CONTACT PERSON: MR BHOWMICK / MR SOLLY
MOB: + 91-9825231721 / + 91 9825225245

Charterers agent at disch port: TBA – sub owrs approval of PDA

**Clause 50.**

At discharging ports, the vessel shall be consigned to Charterers agents. Vessel free from D/A at discharging port but owners husbandry matter will be always to be on owners account.

**Clause 51.**

Charterers agents at discharge ports will give letter to the owners which is confirming port D/A is Receivers account. They will settle directly with Receivers.

**Clause 52.**

Extra insurance, if any due vessel's age to be for Charterers account. Owners contribution US$ 3500/- lumpsum.

**Clause 53.**

In case original bills of lading not available at discharge port, Owners/Master is to release cargo against simple letter of indemnity, in Owners P and I club wording and must be signed by Receivers.

**Clause 54.**

If owners demand charterers to extend canceling date, Charterers to declare their option within 48 hours after owners demand, if Charterers do not extend, Charter Party will be considered cancelled.

**Clause 55.**

Owners to check and ensure vessel suitable to load / discharge fixture quantity basis draft / restrictions at load / discharge ports;

7

**RIDER CLAUSES**
M/V "LION PRINCESS" – C/P DATED 13TH NOVEMBER 2005
BAGGED RICE KANDLA/PORT APPAPA OR TINCAN AND PORT HARCOURT
A/C DEOL MARINE SERVICES

**Clause 56.**
Charterers arrange confirm from receivers which is confirming Owners will not be responsible damage of cargo which done by their stevedores.

**Clause 57.**
Any time lost due to breakdown of vessel's derricks / gears at loading / discharging port not to count as laytime and any expenses incurred to be for Owners' account.

**Clause 58.**
If required by Master, watchman for security of vessel to be provided by Charterers at disport.

**Clause 59.**
Owners will not be responsible for any claims arising or resulting from shortage and / or short landing of cargo including torn and / or empty bags and bags lost overboard during discharge operation by stevedores.

However, vessel will be responsible for any damage to the cargo caused by leakage / ingress of seawater fresh / rain water or oil if due to any deficiency in hatch covers / ventilators and / or vessel's pipeline.

**Clause 60.**
Owners guarantee that the vessels comply with all laws and regulation in the trade vessel will be employed throughout the duration of the charter party. The vessel to have all valid certificates, failing which consequences and expenses arising therefrom to be for owners account.

**Clause 61.**

This charter party to be kept strictly private and confidential.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

8