# EXHIBIT E
# TO THE
# AFFIDAVIT OF THOMAS H. BELKNAP, JR.

# In The Matter Of:

## *FAR EASTERN SHIPPING CO. PLC,. v.*
## *SEA TRANSPORT CONTRACTORS*

---

*March 4, 2008*

---

*CONFERENCE*
*SOUTHERN DISTRICT REPORTERS*
*500 PEARL STREET*
*NEW YORK., NY 10007*
*212-805-0300*

Original File 834UFARC.txt, Pages 1-38

**Word Index included with this Min-U-Script®**



**Page 1**

[1] 834UFARC
[2] UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
[3] ------------------------------x
[4] FAR EASTERN SHIPPING CO. PLC,
[5]            Plaintiff,
[6]      v.                          07 CV 9887(PAC)
[7] SEA TRANSPORT CONTRACTORS
    LIMITED, et al.,
[8]
[9]            Defendants.
[10] ------------------------------x
[11]                                New York, N.Y.
                                   March 4, 2008
[12]                                11:30 a.m.
[13] Before:
[14]            HON. PAUL A. CROTTY
[15]                                District Judge
[16]            APPEARANCES
[17] BLANK ROME LLP
         Attorneys for Plaintiff
[18] BY:  THOMAS HUNT BELKNAP, JR.
[19]
[20] CHALOS, O'CONNOR & DUFFY, LLP
         Attorneys for Defendants
[21] BY:  OWEN FRANCIS DUFFY, III
[22]
[23]
[24]
[25]

**Page 2**

[1]    . THE DEPUTY CLERK: Far Eastern Shipping Co. PLC. v.
[2] Sea Transport Contractors Limited, et al., docket No. 07 CV
[3] 9887.
[4]    Will plaintiff please state your appearance for the
[5] record.
[6]    MR. BELKNAP: Tom Belknap, from Blank Rome, your
[7] Honor.
[8]    THE COURT: Good morning.
[9]    MR. DUFFY: Your Honor, Owen Duffy, from Chalos,
[10] O'Connor & Duffy, for the defendants Sea Transport Contractors,
[11] Marachart, Sword Trading, Ambient Shipholding and Tough Trader
[12] Maritime.
[13]    THE COURT: You are a busy man this morning,
[14] Mr. Belknap, before we get started, I am reading the verified
[15] complaint at paragraphs 10 and 11. This is your verified
[16] amended complaint. What exactly is the consignee's complaint
[17] against your client? Looking at 10 and 11, 10 says that you
[18] can deliver the rice that was loaded in China anyplace in
[19] Africa.
[20]    Paragraph 11 says that the rice loaded in India had to
[21] go to Loma Togo.
[22]    As I read this, in paragraph 12, it suggests that some
[23] of the rice that should have been unloaded in Togo was in fact
[24] unloaded on the Ivory Coast, but other than that, maybe you can
[25] tell me what exactly is the dispute between the consignee and

**Page**

[1] the shipowner.
[2]    MR. BELKNAP: The dispute, your Honor, is for
[3] misdelivery of the cargo which the cargo interests claim
[4] resulted in their not receiving the cargo. I will confess that
[5] I did not go back and look at the documents on that particular
[6] part of the claim in preparation for today's hearing, but my
[7] recollection is that there were instructions given by the
[8] charterer to deliver the bills of lading to the cargo at one
[9] particular port. The instructions were subsequently amended,
[10] and there was some question about whether the instructions that
[11] were given were appropriate or not.
[12]    THE COURT: I am reading the allegations of the
[13] complaint which is all I have before me, and it says with
[14] regard to the goods loaded in China had provided for discharge
[15] at any African port.
[16]    And then in paragraph 11 it says that the goods loaded
[17] in India -- and they list the five bills of lading -- all for
[18] discharge in Loma Togo.
[19]    That is 10 and 11, right?
[20]    MR. BELKNAP: Yes.
[21]    THE COURT: And then 12 says that some of the goods
[22] that were for Loma Togo were in fact unloaded in the Ivory
[23] Coast. And the change that was made in the direction of the
[24] ship was, it was supposed to go to Douala, Cameroon, but the
[25] vessel was redirected to Loma Togo. So what exactly is the

**Page**

[1] claim of the consignee against your company, against the Far
[2] Eastern Shipping Company?
[3]    MR. BELKNAP: I'm sorry. If I may just go back and
[4] make sure that I am clear before I answer the question, your
[5] Honor.
[6]    THE COURT: You may want to take a look at paragraphs
[7] 10, 11, 12 and 24.
[8]    It is difficult for me to ascertain exactly what the
[9] dispute is.
[10]    MR. BELKNAP: Your Honor, what I am remembering is
[11] that the actual claim is not under every one of the bills of
[12] lading as identified in paragraph 11, and I think that's where
[13] the confusion is.
[14]    I am sorry that I don't have this clearly at hand. I
[15] should have. But there's a number of bills of lading that are
[16] identified in paragraph 11.
[17]    THE COURT: Right. Some of those bills of lading,
[18] apparently, the cargo was destined for Loma Togo and was
[19] discharged in the Ivory Coast, at least two of the bills of
[20] lading, 03 and 05.
[21]    MR. BELKNAP: Now, rereading the complaint, I am
[22] getting a little clearer.
[23]    The original instructions were as set out in paragraph
[24] 11 of the complaint.
[25]    Paragraph 12 states that, as to a couple of bills of

Case 1:07-cv-08715-RJH    Document 20-6    Filed 04/24/2008    FAR EASTERN SHIPPING CO. PLC, v.

March 4, 2008

SEA TRANSPORT CONTRACTORS

Page 5

[1] lading, numbers 03 and 05, instructions were revised and the
[2] cargo was discharged in the Ivory Coast against the bills of
[3] lading and letters of indemnity that were issued by the
[4] charterer, STC.
[5]   STC, as in paragraph 13, then ordered the vessel to
[6] Douala, Cameroon to discharge the remaining cargo.
[7] Subsequently, they changed their instructions to discharge the
[8] cargo in Loma Togo.
[9]   **THE COURT:** Which is what the bills of lading call
[10] for. It said any port in Africa and Loma. So other than the
[11] misdelivery which is set forth in paragraph 11 -- I am trying
[12] to find out what is the dispute. Maybe it doesn't make any
[13] difference, but I've got an inquiring mind here.
[14]   **MR. BELKNAP:** I understand. To be honest, I would
[15] have to go back to the documents.
[16]   **THE COURT:** Can you tell me, Mr. Belknap, what is the
[17] status of the arbitration that commenced on April 13, 2007 by
[18] the consignees against your client?
[19]   **MR. BELKNAP:** It is the cargo interests against our
[20] client. It is ongoing. The parties have both nominated
[21] arbitrators, and I understand that is where it stands right
[22] now.
[23]   **THE COURT:** It says here it started on April 13, 2007.
[24] So you are coming up on the one-year anniversary. Is that the
[25] normal span of time for arbitration?

Page 7

[1]   **MR. BELKNAP:** The reason is that we have no security
[2] claim and both arbitration and the litigation in London are
[3] extremely expensive. It is actually quite common not to
[4] commence an action until there is some prospect of actually
[5] recovering on an award if one is given.
[6]   **THE COURT:** Is that a way of saying your claim against
[7] STC in the charter arbitration and in the indemnity before the
[8] high court of justice are not ripe?
[9]   **MR. BELKNAP:** No, your Honor.
[10]   It is a way of saying that our clients are in a
[11] position right now of facing a very large liability cargo
[12] interest that they may very well never be able to recover
[13] against the charterers. And the only way that they are going
[14] to be able to recover against the charterers is if they can
[15] actually obtain security for their claims, because having an
[16] arbitration award that is backed by no money whatsoever is of
[17] no value whatsoever.
[18]   It would be a very expensive prospect to obtain an
[19] arbitration award now. They could commence arbitration today,
[20] but it is our position that they have a presently ripe claim if
[21] they were to do so, but there is very little point in
[22] commencing an arbitration to obtain an award that has no
[23] prospect of being recovered upon, and that is the position that
[24] they are in right now.
[25]   **THE COURT:** Mr. Duffy, why don't you tell me what your

Page 8

[1]   **MR. BELKNAP:** I believe it is, as a matter of fact.
[2]   **THE COURT:** They don't do any better than we do here
[3] in the Southern District?
[4]   **MR. BELKNAP:** I try to tell my clients as often as
[5] possible that we do much better here in New York than in
[6] London.
[7]   **THE COURT:** Mr. Belknap, what is the position of your
[8] client in this arbitration proceeding?
[9]   **MR. BELKNAP:** The position is that there is no
[10] liability or that the liability should be on the part of the
[11] charterer, STC, and that they should be responsible for any
[12] misdelivery.
[13]   **THE COURT:** But they are not parties to this
[14] arbitration?
[15]   **MR. BELKNAP:** They are not parties to this
[16] arbitration, that's correct. Our client has an arbitration
[17] in --
[18]   **THE COURT:** That is covered in paragraphs 64 and 65,
[19] correct. Arbitration to London, Hyde Park. 64 deals with the
[20] arbitration under the charter and 65 deals with the letters of
[21] indemnity which are before the high court of justice.
[22]   **MR. BELKNAP:** That's correct, Judge.
[23]   **THE COURT:** You have not commenced either action?
[24]   **MR. BELKNAP:** That's correct.
[25]   **THE COURT:** Why not?

Page 8

[1] position is. As I read your papers, you have two positions.
[2] As to STC, you say that the claims are not ripe and so they are
[3] not maritime claims and subject to Rule B; the bulk of the
[4] claim is not ripe?
[5]   **MR. DUFFY:** Yes.
[6]   **THE COURT:** With respect to Marachart, Sword, Ambient
[7] and Tough Trader, they are not alter egos for STC?
[8]   **MR. DUFFY:** Correct, your Honor.
[9]   I believe, just listening to you for a few minutes,
[10] you have read and properly understand the papers.
[11]   Just to put the whole argument in context, I think as
[12] Mr. Belknap said, they don't want to go to arbitration against
[13] anybody in London until they have security ahead of time. And
[14] that is the whole gist of this Rule B process, that that has
[15] been initiated in the United States. It is part of one of the
[16] fundamental problems. It reverses the traditional roles when
[17] you go ahead and you seek and get your judgment and then try to
[18] enforce it.
[19]   If you look at this complaint, this complaint is
[20] fairly large, 70-some odd allegations. But all through the
[21] complaint, what are we looking at? We are looking at a Russian
[22] plaintiff, a foreign vessel. The defendant Marachart is a
[23] Cyprus company. The other companies are Liberian or Singapore.
[24] We are dealing with claims asserted by Swiss banks where they
[25] initiated proceedings in Singapore and then they go and file an

Page 9

[1]  arbitration in London.
[2]       What is the connection to New York? Why are we here
[3]  in this court in the United States today?
[4]       And the only reason is because of Rule B. And the
[5]  only reason is that they were able to get a Rule B maritime
[6]  writ of attachment, and they did establish some quasi in rem
[7]  jurisdiction over a limited amount of money belonging to the
[8]  defendants Tough Trader and Ambient Shipholding.
[9]       **THE COURT:** That is about $250,000?
[10]       **MR. DUFFY:** Correct, your Honor. And that's the
[11] substance of this Court's jurisdiction right now. That is the
[12] only basis for its jurisdiction over any of the parties.
[13]      Now, they come in with this claim that they have not
[14] initiated in London against us yet, for which they have
[15] incurred no liability in London. I would concede to you that,
[16] yes, there are some ripe claims in there. There's the claim
[17] for cargo damage of about $164,000 --
[18]      **THE COURT:** You have conceded about 1.5 million.
[19]      **MR. DUFFY:** I conceded about 1.5 million. That's part
[20] of the problem. Then they inflate it up into a $12 million
[21] claim.
[22]      **THE COURT:** It is only 11.
[23]      **MR. DUFFY:** It is 11.9.
[24]      **THE COURT:** You are rounding up.
[25]      **MR. DUFFY:** It sounds better.

Page 1

[1]  enough, while you were highly critical of Judge Wood and her
[2]  decision, even there she didn't allow the piercing of the veil.
[3]      **MR. DUFFY:** Yes, your Honor, but I believe that was
[4]  the case that opened the floodgates for the other cases that
[5]  came along, and they all followed suit.
[6]      I think probably Judge Sweet was the one that at least
[7]  put a little bit of a cork in the dam. And if you read his
[8]  decision he said, while I am going to go along with what
[9]  everybody else is doing, I am going to go along with that
[10] standard, but I want some factual allegations that there was
[11] domination. I want some factual allegations that show the
[12] elemental principle of alter ego, and he didn't find that in
[13] the Dolco case.
[14]      **THE COURT:** Let me ask you a question. Starting with
[15] paragraph 32 and going through paragraph 60 -- not 61, which is
[16] the conclusion -- but what are the allegations in the
[17] complaint? Why are they inadequate to show that the corporate
[18] veil should not be pierced here? They show common ownership,
[19] common shareholders, common directors, common officers, a
[20] common location, and I don't think you doubt that?
[21]      **MR. DUFFY:** Not as far as Marachart and the STC, I do
[22] not.
[23]      **THE COURT:** Why isn't that enough to pierce the veil?
[24]      **MR. DUFFY:** Because if you read Mr. Raisis'
[25] declaration, this is the way business works. His father had a

Page 10

[1]       And they sue their contractual party STC, and then
[2]  they also sue Marachart, Sword Trading, Ambient and Tough
[3]  Trader on the alter ego theory.
[4]       And I think one of the key points of this, to really
[5]  understand the alter ego argument is that if you look at their
[6]  complaint -- and it is paragraph 64 -- and the basis of the
[7]  complaint against the alter ego defendants is by virtue of
[8]  their roles as alter egos and/or principals of STC, any
[9]  arbitration award issued against STC in connection with this
[10] dispute is equally binding upon Marachart, Sword, Ambient
[11] and/or Tough Trader.
[12]      Who says? Nobody has made that determination yet.
[13] That is just an allegation.
[14]      And they try to get a prejudgment attachment of
[15] property over those parties based on that prejudgment
[16] attachment, which they will have to get an arbitration award
[17] and have to prove that they are in fact the alter egos. That's
[18] the way it should work, and that is a contingent claim as well.
[19]      That is the problem with some of the cases that have
[20] been decided in this court. And then if you read my papers, I
[21] am very critical of Tideline and all of the other cases that
[22] went through this. I think that they are putting the cart
[23] before the horse and they shouldn't be allowing a party to come
[24] in and attach an alter ego's assets.
[25]      **THE COURT:** Even in Tideline, Judge Wood, strangely

Page 1

[1]  company. They operated that company and a couple of
[2]  businesses.
[3]       He is a young man. He decides, well, I'm going to
[4]  start another company and get into a different venture, and,
[5]  yes, we will have the same directors and everybody else, but
[6]  where is the disregard of corporate formalities?
[7]      **THE COURT:** We have three ships, each of which is
[8]  separately incorporated as its own company.
[9]      **MR. DUFFY:** Correct, your Honor.
[10]      **THE COURT:** Marachart which is a manager and STC which
[11] is a separate charterer. I guess it charters vessels
[12] independently --
[13]      **MR. DUFFY:** It is a chartering company, as I have
[14] heard people call it.
[15]      If you look at it in that light, I will concede you
[16] the point that they have established directors of Marachart --
[17] there is a connection between Marachart and STC, no doubt about
[18] it.
[19]      If you look at the way this claim goes, he wants to go
[20] in a triangle. He wants to pierce the veil of STC to go up to
[21] Marachart. Then he wants to pierce down into companies that
[22] are managed, whose vessels are managed by Marachart. And then
[23] he wants to come back and hit at STC again and say, these three
[24] companies over here are the dominating companies.
[25]      There is no allegation in the complaint that any of

### Page 13

[1] those even had anything to do with the vessel. There is no
[2] allegation in the complaint that any of those companies ever
[3] had anything to do with STC at all.

[4]   **THE COURT:** Are you familiar with the analogy of
[5] Tinkers to Evers to Chance?

[6]   **MR. DUFFY:** Yes, I am, your Honor.

[7]   **THE COURT:** That's an old baseball analogy.

[8]   **MR. DUFFY:** They were very good at it, but I think
[9] that the ball dropped somewhere along the way here.

[10]   **THE COURT:** But the allegations here are that
[11] Marachart dominates the affairs of the three individual
[12] ships -- Ambient, Tough and Sword.

[13]   **MR. DUFFY:** That's an allegation.

[14]   **THE COURT:** That's an allegation.

[15]   And then because STC and Marachart are the same
[16] company --

[17]   **MR. DUFFY:** That's the allegation.

[18]   **THE COURT:** Again, that is the allegation.

[19]   Therefore, in going against STC, you get Marachart and
[20] you also get the three ships managed by Marachart.

[21]   **MR. DUFFY:** Yes, your Honor.

[22]   **THE COURT:** That is the line that Mr. Belknap is
[23] following. Now, what is wrong with that?

[24]   **MR. DUFFY:** In baseball maybe you will get the out at
[25] the end, but there is a disconnect between Sword, Ambient and

### Page 14

[1] Tough Trader. They are single-owner vessel companies. In
[2] order to have alter ego liability, he has to prove that those
[3] companies committed a fraud or that they dominated the
[4] subsidiary company. That is the essence of alter ego liability
[5] in this circuit, and he cannot prove that and he has not
[6] alleged it.

[7]   **THE COURT:** All right. I understand your point.

[8]   What do you say about why Mr. Belknap or why FESCO is
[9] not entitled to an attachment in the amount of $11.9 million?

[10]   **MR. DUFFY:** Your Honor, that is all a contingent
[11] liability. If you read the complaint, he says, look, our other
[12] ship went to Singapore, somebody arrested, we had to put up a
[13] bond. What happened? They put up a bond of $6 million. The
[14] court vacated it. It was a wrongful arrest. It was not
[15] proper. They are not out anything, maybe the legal fees and
[16] maybe that's what I am giving $1.5 million, but they didn't
[17] incur any liability in Singapore.

[18]   Then they said, we are coming here in London. They
[19] haven't posted any security in London. There is no security.
[20] This thing has been going on for a year and they haven't done
[21] anything yet.

[22]   **THE COURT:** Do you know what is going on in the high
[23] court of Singapore? I gather one of the consignee's bank took
[24] an appeal.

[25]   **MR. DUFFY:** I am not a party to that action.

### Page 15

[1]   **THE COURT:** Do you know, Mr. Belknap?

[2]   **MR. BELKNAP:** That is correct, your Honor. There has
[3] been an appeal taken.

[4]   **THE COURT:** What is the status of the appeal?
[5] Recently there was an argument on it, but I can't say exactly
[6] when but it is still awaiting decision.

[7]   **MR. DUFFY:** I realize the alter ego things are a
[8] little bit heady and courts have struggled with them. Let me
[9] just make this a little bit easy for you.

[10]   **THE COURT:** Anything you can do to make it simple for
[11] me, I would appreciate it, but I don't think it was that heady
[12] to be honest with you, but go ahead.

[13]   **MR. DUFFY:** I do, and I think it has kind of skirted
[14] the line a little bit too thin, and I think sooner or later
[15] somebody has to put a stop to it or otherwise we are going do
[16] run into trouble. But this case is a little bit easier.

[17]   If you look at my reply papers, I cited a case, Blue
[18] Isle Navigation and also the Dolco investment case, and they
[19] both stand for the proposition -- and this is even under Aqua
[20] Stoli's minimal law requirements -- the property of the
[21] defendant has not been found in the district, the attachment
[22] must be vacated and the complaint dismissed.

[23]   You consider in this case, STC, they have not attached
[24] any property of STC, so they don't have any jurisdiction
[25] over --

### Page 16

[1]   **THE COURT:** I understand that argument, but it doesn't
[2] carry any weight with me, Mr. Duffy, because under Mr.
[3] Belknap's theory there is no difference between STC and
[4] Marachart and the Raisis companies. I understand your
[5] argument, but Mr. Belknap would say, listen, it is all one big
[6] ball of wax, all five of those defendants are one and the same.
[7] They are all together. If I can go after one, I can go after
[8] them all.

[9]   **MR. DUFFY:** I think when you stretch it to Ambient and
[10] Tough Trader, that is stretching it way too far. There is no
[11] evidence that these companies had anything to do with STC, that
[12] they had anything to do with the operations of STC. That is
[13] the whole idea of why people start separate companies for
[14] separate businesses.

[15]   There is a presumption of separateness and you just
[16] can't overcome it by allegations and just go through -- it is
[17] almost like I sued General Motors and said, who owns the stock
[18] of General Motors. Am I allowed to go after them as well? It
[19] is just going way too far.

[20]   **THE COURT:** Thank you, Mr. Duffy.

[21]   Let's take these things in order.

[22]   **MR. BELKNAP:** I am sorry to interrupt you.

[23]   You had asked the question before about the nature of
[24] the cargo claims, and I had a chance to look back through the
[25] complaint a little bit and find what I was looking for before,

Page 17

[1] which is in paragraph 21.

[2] There is a block of quotation, and this is actually
[3] taken from the consignee's own papers that they submitted in
[4] the Singapore action where they described their claim. And I
[5] think, obviously, they have done it better than I did in my
[6] attempt to answer your question before.

[7] THE COURT: Yes. I tried to parse this last night,
[8] but there are so many "ands" and "ors" in it that I gave up.

[9] MR. DUFFY: I accept that it is not clear. I think
[10] the intent was to throw in a number of different causes of
[11] action. The things are for breach of charter party, reversion,
[12] wrongful detention --

[13] THE COURT: Those are just words. I want to know, in
[14] substance, in laymen's language exactly what the complaint is
[15] because one bill of lading says deliver everything to Africa.
[16] The other one says parts of anything can be delivered to
[17] Africa -- that's the Chinese goods. And the Indian goods say
[18] deliver only to Loma Togo.

[19] Since they were delivered to Loma Togo, I said to
[20] myself, well, what is the precise bounds of the dispute, and
[21] this is just lawyers' part -- "and or contained, and or
[22] conversion and/or wrongful detention and/or wrongful
[23] interference, discharge the cargo of rice from none genuine --
[24] it doesn't tell me anything at all. I appreciate your offering
[25] it to me, but it doesn't really answer my question.

Page 18

[1] MR. BELKNAP: If it would help the Court I can
[2] supplement that.

[3] THE COURT: That's OK. I don't think its outcome is
[4] determinative.

[5] Tell me why, in light of these decisions by Judge
[6] Karas and other judges similarly minded -- Judge Kaplan, Judge
[7] Haight, Judge Scheindlin -- who suggest that claims for
[8] indemnity, unripe claims for indemnity are not the kind of
[9] actions captured within Rule B of the maritime rules.

[10] MR. BELKNAP: There is one very obvious explanation,
[11] and it is one that I think was strikingly absent from any
[12] reference in the defendants' papers at all, which is a document
[13] called the letter of indemnity. It was a document that was
[14] issued by the charterers to our client, specifically in order
[15] to obtain discharge of these cargos pursuant to their
[16] instructions.

[17] There are copies of them that are attached to Exhibit
[18] 3 to my affidavit that was submitted and, unfortunately, it is
[19] not the clearest copy but I think it is readable. If it is
[20] not, it is repeated in other places and I can refer you to
[21] them.

[22] Probably the easiest thing to do is read paragraphs 1,
[23] 2, 3 and I will summarize them here.

[24] Paragraph 1 says:

[25] In consideration for following instructions and

Page 1

[1] discharging the cargo, they will indemnify you and hold you
[2] harmless with respect to any liability, loss, damage or
[3] expense --

[4] THE COURT: Have you suffered any liability or loss?

[5] MR. BELKNAP: Yes. This is an important point, and
[6] this is the point that I raised in our opposition papers. I
[7] regret having cited a number of English decisions, but this is
[8] actually an issue of English law.

[9] Your Honor, if I can refer you to point 2 of our
[10] opposition to the motion relating to Sea Transport's motion
[11] and, particularly, pages 4 and 5, and this particular point is
[12] actually addressed in a decision that is referred to on page 7.

[13] In this case, the Caroline P and the other case cited,
[14] Basma v. Larson, the court, in a different context admittedly,
[15] considers this identical situation of whether an indemnity
[16] against liability is a present cause of action or a future
[17] cause of action. And the court says, if the indemnity is an
[18] indemnity against liability as it was held to be in Basma v.
[19] Larson, the cause of action will come into existence when A
[20] here incurs liability to B, the cargo interests --

[21] THE COURT: Isn't there something that is a little bit
[22] askew here? You are taking the position in regard to the
[23] arbitration that you are engaged in in London that you owe
[24] nothing and yet you want to take 10 million or 11 million
[25] dollars, almost 12 million dollars from what you say is a

Page 2

[1] thinly capitalized company which will probably shove it into
[2] bankruptcy, when your position throughout has been, I have no
[3] liability to the cargo interests. Why are you entitled to $11
[4] million? What about that language in the cases like the
[5] Greenwich case that suggests that a court in admiralty has
[6] equitable powers to adjust the size and the amount that you are
[7] attaching?

[8] MR. BELKNAP: Your Honor, the only reason that we are
[9] in the situation that we are in -- and when I say "we," I mean
[10] FESCO, of course is because FESCO followed instructions given
[11] to it by the charterer as far as discharging the cargo that
[12] were different and inconsistent with the bills of lading.

[13] In consideration for doing so they obtained from the
[14] charterer this letter of indemnity. The letter of indemnity
[15] was specifically designed to address this very situation where
[16] because of one reason or another, whether it is a valid claim
[17] or an invalid claim, the cargo interests --

[18] THE COURT: So you can maintain that at zero, and you
[19] get $10 million from Duffy's clients?

[20] MR. BELKNAP: Absolutely, and to be perfectly honest,
[21] we are doing the charterer a favor by taking that position.

[22] THE COURT: I don't think it is a favor.

[23] MR. BELKNAP: If they would like to defend themselves,
[24] they are perfectly entitled to come in and defend themselves,
[25] what they should be doing. This says that if there is even a

Page 21

[1] threat of an arrest of our client's vessel in respect of cargo
[2] claims, that STC is required to post the security directly to
[3] the cargo interests. That is what paragraph 3 of the letter of
[4] indemnity says.
[5]         THE COURT: How much money is your client out of?
[6]         MR. BELKNAP: Out of pocket, I think the 1.5 million
[7] is probably about right, but they are facing liability to the
[8] cargo interests of the full amount of 11 point something
[9] million dollars.
[10]         THE COURT: Have you reached any conclusion as to why
[11] you have not been successful in your attachment proceedings
[12] against Sea Transport?
[13]         MR. BELKNAP: Our conclusion is -- this is based on
[14] our market research -- that STC has stopped trading and
[15] essentially wrapped up its affairs.
[16]         THE COURT: You have not been successful against
[17] Marachart, Sea Transport or Sword, is that correct?
[18]         MR. BELKNAP: That's correct.
[19]     To be honest, my suspicion is that Marachart has
[20] gotten wind of this and has figured out some other way to
[21] transfer funds. I suspect that we probably won't attach any
[22] further funds of any of the other defendants either because
[23] they have figured a way to transfer money other than by --
[24]         THE COURT: -- transiting the American banking system
[25] of --

Page 22

[1]         MR. BELKNAP: -- transiting money in some other
[2] currency or, more likely, they have set up some kind of paying
[3] agent who can pay and receive funds on their behalf. I have
[4] certainly seen that happen many times before.
[5]         THE COURT: Let me ask another question, and it is not
[6] relevant to this particular case, but let me get your views on
[7] it.
[8]     How long do you think the writ of attachment ought to
[9] last because under the CPLR, it lasts for 60 days or 90 days
[10] and then it expires?
[11]         MR. BELKNAP: Your Honor, I don't think that the CPLR
[12] would have any bearing on this at all.
[13]         THE COURT: No, I mean writ of attachment.
[14]         MR. BELKNAP: As long as there is due diligence to try
[15] to serve the writ, which we could do in half a day, I don't see
[16] any reason why it wouldn't go on indefinitely. There is no
[17] real reason why it shouldn't. I can't think of a single reason
[18] why. Obviously this is a situation where, in order to obtain
[19] security, which is after all the purpose of Rule B in the first
[20] place, the plaintiff should be given the opportunity to
[21] continue to serve the writ. There is no reason why the reason
[22] for obtaining the attachment is any less valid one month or two
[23] months of even a year from now than it is today.
[24]         THE COURT: If you still had the underlying exposure,
[25] but the underlying claim is still valid --

Page 23

[1]         MR. BELKNAP: That is exactly right.
[2]         THE COURT: Mr. Duffy, what do you say? You are on
[3] both sides of this issue.
[4]         MR. DUFFY: On that specific question, your Honor?
[5]         THE COURT: Yes.
[6]         MR. DUFFY: I honestly know that there is no rule of
[7] law that says how long a writ of attachment could stay in
[8] effect, but I did have the issue a long time ago in a case,
[9] American Bulk Transport, I believe. And I am not familiar with
[10] all of the details, but I know that the judge in that case
[11] looked at the CPLR for guidance and said, you can't have this
[12] thing going on forever. I think he said it was either 45 or 90
[13] days and it was vacated after that.
[14]         THE COURT: What about Mr. Belknap's point which makes
[15] some sense, which is, so long as the underlying claim is valid
[16] anyplace you can continue to try to attach assets?
[17]         MR. DUFFY: That is preposterous. He is coming in
[18] here with a claim. He has not met the prerequisites for Aqua
[19] Stoli.
[20]         THE COURT: Assume that he does.
[21]         MR. DUFFY: That he is going to keep a net up forever?
[22] I don't think that you should be able to do that, your Honor.
[23] I think it is absurd.
[24]         THE COURT: It is off the point.
[25]         MR. DUFFY: If I may, I would just like to address the

Page 24

[1] point on the LOIs and the underlying claim --
[2]         THE COURT: I have not finished with Mr. Belknap on
[3] that. I interrupted him on an excursion of my own, and then I
[4] got you involved but, Mr. Belknap, go ahead.
[5]         MR. BELKNAP: There was this jurisdiction point.
[6]     I think that the arguments that the defendants are
[7] making about the fact that there is a lack of jurisdiction here
[8] because we haven't actually attached any funds of Marachart, I
[9] think that your Honor anticipated my argument. The whole point
[10] of alter ego --
[11]         THE COURT: You said that there is no difference.
[12]         MR. BELKNAP: A equals B and B equals C and A equals C
[13] and that is the bottom line.
[14]     Specific allegations that are contained in the
[15] complaint, your Honor, certainly did note a number of them
[16] relating to the fact that there were common directors, common
[17] officers, common shareholders, common officers -- there are
[18] other allegations, too.
[19]     I certainly agree that there may be some circumstances
[20] where companies will have common directors and common
[21] shareholders and still be separate entities, but it is a matter
[22] of what the parties do with those entities and how they are
[23] actually run. And if you look at the other allegations that
[24] are contained here about things like one party making payments
[25] for the other or one party guaranteeing obligations --

**Page 25**

[1]    **THE COURT:** I read the allegations about piercing the
[2] veil. That is Count 2. It goes from paragraph 32 up to
[3] paragraph 60. 61 is all conclusions.
[4]    But I notice that there is an awful lot of emphasis on
[5] the work that Sword and Ambient and Tough and their
[6] relationship with Marachart. There is nothing about Sword,
[7] Ambient and Tough in STC. The hook has got to be through
[8] Marachart.
[9]    **MR. BELKNAP:** I concede that now, your Honor, based on
[10] what I know now. We are still at pre-discovery stage.
[11]    **THE COURT:** That's right. I am looking at the
[12] allegations of the complaint, which is what Aqua Stoli told me
[13] to look at.
[14]    With regard to Sword, Ambient and Tough, there is
[15] nothing in those allegations that deal with STC --
[16]    **MR. BELKNAP:** I agree.
[17]    **THE COURT:** The hook is between Marachart and STC that
[18] I have been able to find here, unless you are going to tell me
[19] something different. Marachart made one of the charter
[20] payments that was due and owing to your client, FESCO. But
[21] other than that, what do we have?
[22]    **MR. BELKNAP:** Well, that is a hook.
[23]    **THE COURT:** That is one payment.
[24]    **MR. BELKNAP:** Yes. As directed by the authorities,
[25] the other things that we have talked about on the shareholders,

**Page 26**

[1] common directors, those are relevant factors to be considered.
[2]    **THE COURT:** But they are not outcome determinative.
[3]    **MR. BELKNAP:** They are not, but when you factor in
[4] with others, they are important.
[5]    **THE COURT:** The others? I have cited one. What do
[6] you have besides that one?
[7]    **MR. BELKNAP:** The other one in particular, your Honor,
[8] relates to -- if I can find the paragraphs.
[9]    **THE COURT:** Paragraph 56 might come close, but I don't
[10] think that is substantive. What are the purposes of the
[11] revolving loan from the bank for the three ships, to pay off
[12] EFG Eurobank which you point out, by coincidence, is the same
[13] where payments were made, but that is hardly --
[14]    **MR. BELKNAP:** Your Honor, there are a couple of
[15] others.
[16]    If we look at paragraph 40 of the complaint, we have
[17] Mr. Raisis in another declaration that he gave in connection
[18] with another matter not related to this dispute. He simply
[19] said that he was the controlling mind behind --
[20]    **THE COURT:** He could be the controlling mind behind
[21] all of them.
[22]    **MR. BELKNAP:** I believe he is.
[23]    **THE COURT:** So what? Just because he believes he's
[24] the controlling mind behind all of them, it doesn't mean that
[25] he hasn't observed the appropriate forms. One person like

**Page 2**

[1] Warren Buffet could be the controlling mind behind millions of
[2] different dollars of investments. That doesn't mean that you
[3] ignore his investments and go after him individually.
[4]    **MR. BELKNAP:** It might. It depends on how he runs his
[5] business.
[6]    And paragraph 60 was the one that I was going to refer
[7] you to, and it relates to, again, this other matter that we
[8] obtained the affidavit of Mr. Raisis where he is giving advice
[9] to other parties about how to use STC as a chartering party in
[10] order to avoid having assets exposed to attachment.
[11]    Besides using one company for that kind of purpose,
[12] one of the other factors that should be weighed is whether a
[13] company is properly capitalized to meet its obligations.
[14]    **THE COURT:** Where do you have the allegation that it
[15] is not properly capitalized, other than saying it? Where is
[16] that?
[17]    **MR. BELKNAP:** With due respect, I don't believe that
[18] we need to make a detailed --
[19]    **THE COURT:** You can just say it and then we can attach
[20] assets?
[21]    **MR. BELKNAP:** No, your Honor.
[22]    The collection of allegations here, the rules as I
[23] understand it based on Tideline and others is that the
[24] complaint must create an inference, and that is the term that
[25] is used in the case, an "inference" that the parties are alter

**Page 2**

[1] egos.
[2]    Now, obviously, without having had any discovery at
[3] all, I think we have done much more than simply raise an
[4] inference, particularly when you measure this case compared to
[5] the list of cases that we have cited in our brief.
[6]    There were cases where the single allegation that one
[7] party has made a payment for another is sufficient to have
[8] support at this stage in the proceedings as an alter ego
[9] complaint.
[10]    This is not a trial on the merits. This is simply a
[11] matter of whether we have stated enough to support a claim to
[12] allow us to go forward.
[13]    **THE COURT:** Yes. I understand that. It is before any
[14] liability has been established and before anybody has been
[15] heard, you get to seize assets of people on a theory that all
[16] you have said is the same, that under Aqua Stoli I am told I
[17] have to accept that.
[18]    **MR. BELKNAP:** Based on the case law, the allegations
[19] we have made in the complaint, I think, are much more
[20] substantial than many others that have already been affirmed.
[21]    **THE COURT:** Anything else to say, Mr. Belknap, before
[22] I hear from Mr. Duffy?
[23]    **MR. BELKNAP:** Not at the moment, your Honor.
[24]    **THE COURT:** Thank you very much.
[25]    Mr. Duffy, you want to talk about the letters of

Page 29

[1]   indemnity.

[2]        **MR. DUFFY:** Yes, just a little bit to address the

[3]   underlying claim, your curiosity. I don't believe it is

[4]   outcome determinative in a case like this.

[5]        But I do know that STC -- and I am looking through

[6]   some early e-mails which first came in -- they strongly deny

[7]   the allegations in the complaint about the wrongful discharge

[8]   of cargo in Loma.

[9]        And one of the points that he made early on was that

[10]   they have cited selectively from the letters of indemnity. And

[11]   if you look at the one letter of indemnity, they specifically

[12]   recite that the cargo was shipped for delivery at the Port of

[13]   Loma Togo. That's where the cargo was always destined.

[14]   Apparently, some of the consignee banks got involved and there

[15]   was a change of orders. No one accepted those orders, but the

[16]   owners didn't give those orders.

[17]        The cargo was discharged in the port that it was

[18]   consigned to. The letters of indemnity were issued because the

[19]   bills of lading had not been produced and they wanted to

[20]   deliver the cargo.

[21]        It was also discharged because they went to court in

[22]   Togo, and they got a court order that said this is the rightful

[23]   place to discharge the cargo. Full stop. That's what

[24]   happened. Now these people are coming back and alleging

[25]   breaches of obligation on behalf of the vessel owner.

Page 30

[1]        We hotly dispute whether we have any liability under

[2]   the letters of indemnity, and we also make the real point that

[3]   the consignee's claim is probably bogus. They were not able to

[4]   sustain an arrest in Singapore. The charter, the vessel owner,

[5]   FESCO has not incurred any liability in London yet. So you

[6]   can't restrain our assets for a contingent claim like that.

[7]        And I would answer any questions that you have on

[8]   that.

[9]        **THE COURT:** Do you want to say anything in rebuttal to

[10]   Mr. Belknap's arguments --

[11]        **MR. BELKNAP:** Very briefly, your Honor.

[12]        **THE COURT:** I haven't finished. I was right in the

[13]   middle of the question.

[14]        Do you want to say anything about his arguments on

[15]   piercing the veil?

[16]        **MR. DUFFY:** Yes, I would like to.

[17]        I would agree with you. The hook is Marachart, but I

[18]   think that you have to look at the history of this case. They

[19]   knew who Marachart was when they dealt with STC. They came in,

[20]   and I think in Mr. Raisis's declaration, he tells what

[21]   happened. When they wanted the letters of indemnity, this

[22]   fellow from Marachart was going to issue them on behalf of STC.

[23]        **THE COURT:** And that was rejected? And they said, we

[24]   want STC.

[25]        **MR. DUFFY:** We want STC. They wanted a corporate

Page 31

[1]   guarantee from Marachart or if they believed Marachart was the

[2]   controlling mind or the dominant force, they would have

[3]   requested a guaranty from them. They didn't. What they knew

[4]   was, STC was a separate company. Marachart was a broker. And

[5]   when you get to the hook of Marachart, Marachart has to be

[6]   looked at in two separate blocks.

[7]        **THE COURT:** Marachart is a broker and ship manager,

[8]   correct?

[9]        **MR. DUFFY:** They have two business operations, yes.

[10]   They are a broker, and they are the exclusive broker for STC

[11]   and they are exclusive because the same guy owns the both of

[12]   them.

[13]        Then they have the ship management company. And the

[14]   way the ship management companies operate -- they make a lot of

[15]   allegations about the Raisis family owns this group and blah,

[16]   blah. The way these things work is, these are all single ship

[17]   owning companies that are owned by groups of investors, usually

[18]   incorporated in Liberia or someplace else. They don't have any

[19]   expertise or knowledge about running a ship. They give it to a

[20]   ship manager to run, and it is really an investment vehicle for

[21]   most people. They give it to a ship manager, and they say,

[22]   you take care of all of the trading, all of the engineering and

[23]   everything else like that. Provide us with a full accounting.

[24]   We will take some profits and someday maybe we will decide to

[25]   sell the ship.

Page 32

[1]        That's why you can't go through the local Maracharts

[2]   to get to these people. They are trying to skip through and

[3]   there's a disconnect. You cannot go through Sword, Ambient and

[4]   Tough Trader.

[5]        To answer one question, you said they haven't attached

[6]   anything at Sword. I think Mr. Raisis said that one of the

[7]   companies is really out of business now. They sold their own

[8]   investment, so probably they will never attach any money of

[9]   that company. But the other two, they have attached money.

[10]   But they have nothing to do with STC and cannot be held liable

[11]   as alter egos of STC. You can't pierce, pierce, pierce all the

[12]   way along the line.

[13]        **THE COURT:** I understand.

[14]        Mr. Belknap, I will give you the last word.

[15]        **MR. BELKNAP:** On the alter ego point, he has already

[16]   said, counsel, that Marachart is the exclusive agent for STC.

[17]   We know from the Raisis declaration that Marachart was doing

[18]   all of the business for STC.

[19]        At the same time in his own declaration, Raisis says

[20]   that STC was formed because Marachart didn't have all of the

[21]   appropriate expertise to do the charter. Which is it? He is

[22]   getting into a lot of factual rebuttal to the allegations that

[23]   are made in the complaint, and if we are going to be arguing

[24]   those kinds of facts, we should be entitled to get discovery on

[25]   this issue.

Page 33

[1] That's on the alter ego. That's all that I wanted to
[2] say, but I also very briefly want to go back to this letter of
[3] indemnity because I think paragraph 3 really makes the point
[4] very clearly. What it provides is that if in connection with
[5] the delivery of the cargo, the vessel is detained or should the
[6] arrest or detention thereof be threatened, then the party
[7] providing the letter of indemnity, which is STC, will provide
[8] security to the cargo interests directly whether or not such
[9] arrest or detention or threatened arrest or detention or such
[10] interference may be justified.
[11] The point here is that you don't get to the question
[12] of are the merits claimed by the cargo interests valid or not.
[13] They are vehemently disputing that they are. We are vehemently
[14] disputing that they are. The fact remains that there is an
[15] arbitration against our client. We have spent a lot of money
[16] on it. We have exposure. We have an obligation undertaken
[17] from the charterer --
[18] **THE COURT:** Why isn't that covered by some of the
[19] allegations as to which Mr. Duffy doesn't raise any dispute?
[20] Aren't they covered by those?
[21] **MR. BELKNAP:** They absolutely are covered. And to be
[22] honest with you, I think the fact that he is not disputing it
[23] suggests he is accepting that at least to that extent the
[24] letter of indemnity does have an obligation or might.
[25] But the fact of the matter is that, as far as what the

Page 3!

[1] I am also relying on the language or the teaching of
[2] the Second Circuit in the Patricia Hayes case and Greenwich
[3] Marine which talk about the inherent power of an admiralty
[4] court using its equitable powers to set the appropriate amount
[5] for attachment.
[6] In light of the position of STC, Sea Transport
[7] Contractors, I am going to allow the attachment order in the
[8] amount of $1.9 million to continue. Otherwise, I find that the
[9] attachment in excess of $1.9 million is not appropriate in the
[10] circumstances.
[11] With regard to the piercing the corporate veil, the
[12] allegations set forth in Count 2 of the complaint, the amended
[13] verified complaint, paragraphs 32 through 60, I have read the
[14] Aqua Stoli decision, and Aqua Stoli deals with a situation of
[15] what is appropriate for pleadings purposes under Rule B.
[16] Judge Walker had to confront a tendency in the
[17] Southern District of New York to find a needs plus, in other
[18] words, that Rule B didn't contain all of the requirements for a
[19] maritime attachment and the district court judges could balance
[20] the needs of the parties, whether financial security is really
[21] needed and whether the inconvenience of the attachment
[22] outweighed the effectiveness of the attachment in terms of
[23] providing security to the attaching party. He said nothing at
[24] all about piercing the corporate veil, and so I think that
[25] question has not been addressed.

Page 34

[1] obligation is, there is nothing in the letter of indemnity that
[2] requires us to pay it first. To the contrary, the letter of
[3] indemnity is very, very clear that it is supposed to be picked
[4] up by the charterer in the very first instance so that we,
[5] FESCO, is never in the position that they are in now, where
[6] they have to defend a claim, spend money and hope that they can
[7] recover against the charterer. That is the very point of this
[8] document right here.
[9] **THE COURT:** First of all, I want to thank the parties
[10] for their excellent briefs and the oral argument.
[11] I think I am going to join my brothers and sisters on
[12] the court -- Judges Karas, Haight, Kaplan, Scheindlin and
[13] Chin -- who recently in the last year and a half have issued a
[14] series of decisions that suggests that claims for indemnity
[15] which have not yet matured into the payment of funds are not
[16] appropriate for maritime indemnities.
[17] I know that Mr. Belknap relies on Judge Hellerstein's
[18] decision in the Navalmar case, but I assume that Navalmar was
[19] simply because there arbitration had already commenced and
[20] there had been a partial award, but an award had been made.
[21] And there was, to use Judge Buchwald's decision, a degree of
[22] immediacy so it was no longer speculative. And in these
[23] circumstances, Judge Hellerstein denied vacatur on indemnity
[24] claims even though the occasions for indemnity had not yet
[25] arisen.

Page 36

[1] I recognize there's a decision by Judge Wood and
[2] others which suggests that the Tideline case that I have
[3] referenced suggests that the pleadings requirements as set
[4] forth in Aqua Stoli apply equally to piercing the corporate
[5] veil.
[6] I find, on the allegations of this particular
[7] complaint, that I don't have to make that determination as to
[8] whether or not Aqua Stoli set down new pleadings requirements
[9] for piercing the corporate veil or whether good cause or
[10] probable cause or some other standard has to be alleged because
[11] I find that the pleadings here with regard to alter ego and
[12] veil piercing are insufficient even under Aqua Stoli. They
[13] suggest a close working relationship between Marachart, Sword,
[14] Ambient and Tough Trader, but they are absolutely silent with
[15] regard to -- I'm sorry -- Sword, Ambient and Tough Trader and
[16] having anything to do with STC. The relationship between STC
[17] and Marachart is very, very limited, and I find it is
[18] insufficient to justify the attachment of assets that Marachart
[19] allegedly controls.
[20] So I find that there is no basis for the attachment
[21] against Sword, Ambient and Tough. Inasmuch as there is an
[22] attachment of Ambient of some $4,000 and two attachments
[23] against Tough, one for 137,000 and 145,000, I am going to
[24] vacate both of those attachments. The order of attachment is
[25] limited to $1.9 million but can still proceed against STC,

Page 37

[1]   although I agree with Mr. Belknap's very commonsensical
[2]   practical analysis that, in light of the situation, that
[3]   probably will not yield any positive results for Far Eastern
[4]   Shipping Company.
[5]        That constitutes my disposition on this motion.
[6]        I will enter a brief order incorporating my remarks
[7]   here, my decision delivered orally on the bench into a more
[8]   formal order.
[9]        Anything else?
[10]       Mr. Belknap?
[11]       MR. BELKNAP: Just that I want to make certain there
[12]  is a stay in effect. It is a 10-day stay, normal rules, to get
[13]  instructions about what our client might want to do about the
[14]  order.
[15]       MR. DUFFY: Your Honor, I believe that Rule 62, I
[16]  think it is (d) that is applicable here, that if the Court
[17]  enters an order that there's a stay of 10 days and there is
[18]  authority status, maritime, for the proposition that it applies
[19]  to decisions vacating an attachment.
[20]       THE COURT: Where is it in 62?
[21]       MR. DUFFY: Rule 62, I think it is (d).
[22]       THE COURT: "Stay of proceedings to enforce a
[23]  judgment. If an appeal is taken, the appellant may obtain a
[24]  stay by supersedeas bond, except in an action" --
[25]       MR. DUFFY: It may be 62(a) then, your Honor.

Page 38

[1]        THE COURT: "Except as stated in this rule, no
[2]   execution may issue on a judgment, nor may proceedings be taken
[3]   to enforce it, until 10 days have passed after its entry." So
[4]   you have 10 days.
[5]        MR. BELKNAP: Thank you, your Honor.
[6]        THE COURT: I am told by Mr. Ovalles, who reminds me
[7]   of things, that you should order a copy of the transcript so
[8]   that I can file the transcript with my order. So would you do
[9]   that today?
[10]       MR. BELKNAP: Yes, your Honor.
[11]       THE COURT: Anything else, Mr. Duffy?
[12]       MR. DUFFY: No, your Honor.
[13]  Thank you, your Honor.
[14]       THE COURT: Thank you very much.
[15]            o  0  o
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]